Debra KEACH and Patricia Sage, Plaintiff,

v.

U.S. TRUST COMPANY, N.A., f/k/a/ U.S. Trust Company of California, N.A., Ellen D. Foster, as Executrix of the Estate of Thomas S. Foster and as Co–Trustee of the Thomas S. Foster Trust executed on April 14, 1994, the Northern Trust Company, an Illinois Corporation, as Co–Trustee of the Thomas S. Foster Trust executed on April 14, 1994, Melvin R. Regal, individually, as trustee or agent of the Steven Jay Regal Trust, as trustee or agent of the Judi Lynn Regal Trust, and as trustee or agent of the John E. Regal Trust, A. Robert Pellegrino, Valuemetrics, Inc., Houlihan, Lokey, Howard & Zukin, Inc., Robert A. Ostertag, Jr., Terry P. Cole, Alan R. Dix, Jon D. Elletson, Stephen P. Bartley, Lyle T. Dickes, James N. Freid, Dale Fujimoto, William J. Gehring, Henry R. Gregory II, John F. Halpin, Richard S. Hodgson, James H. Kyle, John Lappegaard, Gregory K. McAllister, George McKittrick, Michael F. Norbutas, Clayton Patino, Jerry L. Rath-mann, Frederick J. Stuber, W. Thomas Stumb, Mark Swedlund, Leo A. Vandervlugt, Robert J. Wilson, Bruce B. Wright, and Ashley Anne Foster, as trustee or agent of the Ashley Anne Foster Irrevocable Trust, Defendant.

No. 01–1168.

United States District Court, C.D. Illinois.

Feb. 12, 2004.

Dean B. Rhoads, Robert Rhode, Edward Sutkowski, Steven Oates, Sean Anderson, Sutkowski & Rhoads, Peoria, IL, for Plaintiffs Debra Keach and Patricia Sage.

Timothy Bertschy, Heyl, Royster, Voelker & Allen, Peoria, IL, Robert Eccles, Shannon M. Barrett, O'Melveny & Myers LLP, Washington, DC, for Defendant U.S. Trust Company, NA, fka U.S. Trust Company of California.

Richard J. Pautler, Jennifer Baetje, Thompson & Coburn, St. Louis, MO, for Defendants Robert A. Ostertag, Jr., Terry P. Cole, Alan R. Dix, Jon Elletson, A. Robert Pellegrino.

James Bailey, Paul Ondrasik, Jr., Steptoe & Johnson, Washington, DC, Roy Davis, David Lubben, Davis & Campbell LLC, Peoria, IL, for Defendants Valuemetrics, Inc.

Mark Casciari, Ian Hugh Morrison, Sari M. Alamuddin, Seyfarth Shaw, Chicago, IL, for Defendant Houlihan, Lokey, Howard & Zukin, Inc.

Charles Roth, James Springer, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendants Stephen P. Bartley, Dale Fujimoto.

Stephen Gay, Jeffrey Alan Ryva, Husch & Eppenberger LLC, Peoria, IL, for Defendant Lyle Dickes.

Jeffrey Rock, Hasselberg Rock Bell & Kuppler, Peoria, IL, for Defendants James Freid, Richard Hodgson.

John Elias, Robert Riffle, Cynthia Elias, Elias Meginnes Riffle & Seghetti, Peoria, IL, for Defendant William Gehring, Henry Gregory, II, John F. Halpin, James Kyle, John Lappegaard, George McKittrick, Clayton Patino, Jerry Rathmann, W. Thomas Stumb, Mark Swedlund, Leo Vanderlugt, Robert Wilson, Bruce Wright.

Dean Essig, Washington, IL, for Defendant Gregory McAllister.

Charles Roth, James Springer, Joseph Sudow, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendants Michael Norbutas, Frederick Stuber, and for Defendant Ashley Anne Foster, as trustee or agent of the Ashley Anne Foster Irrevocable Trust, and Melvyn R. Regal, individually, as trustee or agent of the Steven Jay Regal Trust, as trustee or agent of the Judi Lynn Regal Trust, and as trustee or agent of the John E. Regal Trust.

## ORDER

MIHM, District Judge.

### I. SUMMARY OF FINDINGS
#### (Pages 1–5)

In 1995, Foster & Gallagher, Inc. ("F & G") was enjoying multiple years of record profits, and the management forecast projected additional years of record profit into the future. On December 20, 1995, the F & G Employee Stock Ownership Plan ("ESOP"), with U.S. Trust Co. ("U.S. Trust") as its trustee, purchased 3,589,743 shares of F & G stock from Thomas Foster ("Foster"), Melvyn Regal ("Regal"), A. Robert Pellegrino ("Pellegrino"), and several other officers and directors at a price of $19.50 per share. For the next two years, F & G continued to enjoy record profits, even exceeding the projections in the management forecast. However, in 1998, F & G's profits began a steady decline that ended when the company declared bankruptcy in 2001. This trial looked at what happened to cause F & G to go from boom to bust and addressed the question of whether any of the Defendants breached a fiduciary duty to the ESOP that resulted in the loss of the value of the F & G stock held by the ESOP.

By the end of the 14–day bench trial in this matter, essentially four claims were left on the table for judicial determination: (1) whether Foster, Regal, and Pellegrino breached a fiduciary duty by failing to disclose material information in connection with the 1995 stock purchase transaction; (2) whether Foster, Regal, and Pellegrino breached a fiduciary duty by causing the ESOP to enter into a prohibited transaction; (3) whether U.S. Trust breached a fiduciary duty by causing the ESOP to enter into a prohibited transaction; and (4) whether U.S. Trust breached a fiduciary duty by failing to take action to investigate and pursue claims against participants in the 1995 stock purchase transaction after the value of F & G stock precipitously declined.

Based on the evidence presented at trial, the Court finds that neither Foster, Regal, nor Pellegrino attempted to conceal material information or knowingly made anything less than full disclosure of such information to U.S. Trust and its due diligence team in connection with the 1995 stock purchase transaction. Accordingly, no duty to disclose material information was breached.

The Court further finds that the ESOP did not pay more than adequate consideration for the stock purchased on December 20, 1995. Although Plaintiffs argued that the fair market value of the F & G stock was substantially less than the $19.50 price that was paid per share and that U.S. Trust did not conduct a good faith/adequate investigation, these arguments were premised on the presumption that information concerning dependency on sweepstakes marketing and increased

governmental regulation of the sweepstakes marketing industry posed either a material risk to F & G in 1995 or a future material risk that was reasonably foreseeable at the time. The weight of the evidence indicated that F & G's officers and directors did not consider these issues to be material at the time, as evidenced by the following: (1) an otherwise inexplicable conversion to a Subchapter S corporation in 1997 (which would only have had positive tax consequences for a company expecting continued profitability); (2) the undersubscription of another stock purchase transaction by the ESOP in 1997 because many officers and directors believed that the stock was worth much more and would continue to increase in value; (3) the immediate refusal of Foster and Regal to sell their remaining shares to the company at $25.00 per share in 1997; and (4) an unsecured $10 million loan from Regal and the Foster Estate to F & G in 1999 in order to assist the recovery of the company. Nor were such issues deemed material by the four lenders that performed their own due diligence investigation prior to loaning F & G $70 million to finance the 1995 stock purchase transaction at favorable interest rates and without requiring collateral. Some of those same lenders agreed to loan an additional $100 million on the same terms in 1997. Uncontroverted and credible testimony at trial from an industry expert also established that such issues were not material at the time of the 1995 stock purchase transaction and did not present a reasonably foreseeable material risk of future harm to F & G. Given these findings, in conjunction with three expert valuations placing the fair market value of F & G stock well in excess of $19.50 per share and the less credible valuation supporting Plaintiffs' position that the value of the stock was substantially less than $19.50 per share, the Court must conclude that the 1995 stock purchase transaction was for adequate consideration and that Foster, Regal, Pellegrino, and U.S. Trust are entitled to the protection of an exemption under § 408(e) of ERISA on Plaintiffs' prohibited transaction claims.

Finally, as the evidence of record established that the cause of the loss to the ESOP was not any material risk to the value of F & G stock due to sweepstakes dependency or governmental regulation of the sweepstakes industry in connection with the stock purchase by the ESOP on December 20, 1995, the investigation and preservation of claims against participants in the 1995 stock purchase transaction as requested by the Plaintiffs would have been fruitless and futile. Thus, U.S. Trust could not have breached any fiduciary duty by failing to take the requested action.

This is an important case to the parties involved, and is also important to many people who have not been directly involved in the litigation but were participants in the F & G ESOP. It is important to the Plaintiffs, who lost their jobs, benefits, and funds expected to provide for their retirement when F & G closed its doors in 2001. It is important to the Defendants, whose professional reputations and personal integrity have been called into question and some of whom also lost their jobs and investments when F & G declared bankruptcy. This case is also important to the community, as F & G was a Peoria institution for many years, and its former officers and employees are well known in this community as neighbors, friends, and personal acquaintances. The Court recognizes the importance of this case and has immersed itself in the facts and arguments of record in order to give this litigation the scrupulous care and attention that it deserves.

The loss of F & G was tragic, and it is completely reasonable for the people who suffered from its demise to want to understand what happened and assign blame to

anyone who could have caused the loss. The Court is very sympathetic to the Plaintiffs and the losses that they have suffered and would have liked nothing more than to have been able to restore to them what they had lost. However, the Court's sympathy cannot change the proven facts of record or the governing law in order to reach a more compassionate result.

What happened to F & G in 2001 may or may not have been the result of mismanagement or poor business decisions in response to the drastic industry change that occurred in 1998. The Court cannot find on the record before it that F & G's demise was brought about by any breach of fiduciary duty in connection with the 1995 stock purchase transaction. Accordingly, the Court finds in favor of Defendants U.S. Trust, Regal, and Pellegrino and against Plaintiffs on the breach of fiduciary duty claims asserted in the First, Third, and Fifth claims for relief asserted in the First Amended Complaint.[1]

The Court would be remiss if it did not note the exemplary quality of the legal representation of all parties in this case. The attorneys were always completely prepared and presented the evidence in a totally professional manner. Hundreds of exhibits were admitted and presented seamlessly. While acting as aggressive advocates on behalf of their clients, counsel for Plaintiffs and Defendants pursued their advocacy in a highly civil manner. No trial judge could ask for anything more.

## II. FINDINGS OF FACT

### Foster & Gallagher, Inc. and Its Employee Stock Ownership Plan

1. At the time of its incorporation in 1951, F & G specialized in marketing gifts, housewares and novelty items through direct mail. In subsequent years, F & G expanded through the acquisition of several companies and as of December 1995 maintained several operating companies or "trade styles" including Breck's, Breck Holland, N.V., Spring Hill Nurseries, Magazine Marketplace, Inc., Magazine Marketplace Telemarketing, Inc., Mauna Loa Macadamia Nut Company of Hawaii, The Popcorn Factory, Michigan Bulb Company (which itself consisted of four separate tradestyles), Stark Brothers Nurseries, Childcraft, and HearthSong. Several of these companies specialized in marketing horticultural products, including flower bulbs.

2. In 1995, Foster was Chairman of the Board of Directors of F & G and was also a Director of Michigan Bulb Company ("MBC"). Foster died on July 11, 1996, and Ellen D. Foster was the executrix of his estate.

---

**1.** Plaintiffs asserted a breach of fiduciary duty based on Foster's actions as their Second claim for relief against Ellen Foster ("Mrs. Foster"), as the Executrix of the Estate of Thomas Foster. On March 5, 2003, this claim was resolved in favor of Mrs. Foster on the grounds that she was not a proper defendant in this capacity as the Estate has been closed for some time, and she had been discharged from her capacity as the Executrix of the Estate. In so ruling, however, the Court noted that the fact that Mrs. Foster as the Executrix was not a proper party to this suit for purposes of fiduciary liability did not mean that Plaintiffs were foreclosed from proving a breach of fiduciary duty at trial based on Foster actions, which could then potentially serve as a predicate for a restitution claim against Mrs. Foster in her capacity as a Co–Trustee of the Thomas S. Foster Trust and other parties in interest. Accordingly, the Court's findings with respect to the alleged breach of fiduciary duty by Foster are included not for purposes of adjudicating fiduciary liability but for purposes of addressing the claim as a predicate for subsequent claims for restitution against parties in interest.

3. Defendant Regal was at all relevant times a shareholder and executive of F & G. In 1995, he was Vice Chairman of the Board of Directors of F & G and a Director of MBC.

4. Defendant Pellegrino was at all relevant times a shareholder and executive of F & G. In 1995, Pellegrino was President of F & G, as well as a Director of both F & G and MBC.

5. On January 1, 1988, F & G established an ESOP that operated as a defined contribution, leveraged employee stock ownership plan, covering substantially all employees of F & G and its subsidiaries. F & G was the sponsor of the ESOP.

6. The ESOP initially purchased 3,587,-573 shares of F & G stock from certain shareholders, including Foster and Regal, using a $3 million cash contribution from F & G and $47 million from the proceeds of a loan through F & G. All ESOP contributions were to be controlled by a trustee "acting under a Trust which forms a part of the Plan."

7. LaSalle National Bank ("LaSalle Bank") was the original trustee of the ESOP. LaSalle Bank was replaced as trustee of the ESOP on March 3, 1989, by Community Bank of Greater Peoria (later known as Magna Bank or Trust Company ("Magna Bank")). In August 1995, Defendant U.S. Trust was retained at trustee specifically in conjunction with a proposed purchase of additional F & G stock by the ESOP ("ESOP II").

8. On December 20, 1995, U.S. Trust was formally appointed as successor trustee, and Magna Bank was given notice of its removal as trustee of the ESOP. Upon receiving confirmation of U.S. Trust's acceptance of the trusteeship, Magna Bank accepted its removal and waived any technical notice requirements.[2] From that point on December 20, 1995, forward, U.S. Trust was successor trustee and a fiduciary with respect to the ESOP. In this capacity, U.S. Trust held the plan assets, managed the assets of the ESOP, made distributions to participants, administered the payments of interest and principal on certain loans, and made the decision to consummate the 1995 stock purchase transaction on behalf of the ESOP.

9. Plaintiffs Debra K. Keach and Patricia A. Sage were employees of F & G and participants in the ESOP.

### MBC and Its Sweepstakes

10. In 1992, F & G explored the possibility of acquiring MBC. MBC was a direct mail marketer of bulbs, plants, and seeds, primarily for home gardens. MBC performed all of its advertising, mailing, order processing, warehousing, and shipping from its home office in Grand Rapids, Michigan.

11. MBC had four primary tradestyles: Michigan Bulb, Flower of the Month, Rockwood Gardens, and Home and Garden Value–Mart. MBC used a sweepstakes program as part of its direct mail advertising. MBC's promotions had a "[s]trong sweepstakes orientation."

12. In anticipation of its acquisition of MBC, F & G sent several employees to MBC's facilities to perform due diligence inquiries intended to confirm the possibility of synergistic effects, identify areas for potential improvement, and determine whether and how to integrate MBC into F & G's existing operations.

13. F & G ultimately purchased MBC in October 1992. Foster, Regal and Pelle-

---

2. Plaintiffs initially asserted a claim against U.S. Trust based on the theory that it acted without authority in consummating the 1995 stock purchase transaction on behalf of the ESOP because Magna Bank had not been given sufficient notice. However, at trial, a directed verdict was entered in favor of U.S. Trust on this claim.

grino were the directors of MBC, which appears to have been a formality, as there were no board of directors meetings for MBC that were separate and apart from F & G board meetings.

14. F & G made a number of post-acquisition changes to MBC, including improved storage facilities, new product development, a renewed focus on service, and better training of customer service employees. It also hired a new president, Robert Ostertag ("Ostertag"), and shifted some experienced personnel from other F & G operations.

15. Following these changes, MBC's customer retention rate increased from approximately mid–20% retention at the time of the acquisition to a rate of 30% or more by the beginning of 1995, which was considered to be within industry norms. MBC's revenues also grew dramatically following the acquisition, from $68.4 million in 1993 to $91.4 million in 1994, and $68 million in the first half of 1995.

16. As part of its direct mail marketing, MBC utilized a sweepstakes program typically consisting of three elements: (a) an "everybody wins" sweepstakes where everyone that returned an entry wins a "special prize" regardless of whether or not they placed an order; (b) a base sweepstakes that awarded a total of $250,000 annually and had a $100,000 grand prize; and (c) a color-coded or pre-selected giveaway in which the winners were determined before the mailing. For 1995, MBC's "special prizes" were a package of flower seeds or a gift certificate for a free family portrait from Olan Mills.

17. MBC's combination Order Form and Prize Validation and Claim Form included a "Prizewinner Release" to be initialed by the "verified First Round Winner" giving MBC permission to use the winner's name and likeness for advertising and publicity purposes should the winner receive the $100,000.00 Grand Prize. Im-

mediately below the Prize Validation and Claim Form was MBC's Order Form. The back of the Prize Validation and Claim Form and Order Form included an "URGENT MESSAGE" from the "PRIZE DISTRIBUTION CENTER," which stated in part: "THE LAWS OF PROBABILITY ARE ON YOUR SIDE if you have been issued a pre-selected winning color-coded reply envelope."

18. In 1991 MBC retained an attorney, John Awerdick, a specialist in advertising law with a focus on sweepstakes, to review its mailings for compliance with the law. Awerdick interacted directly with Thomas Stumb ("Stumb"), MBC's chief financial officer, who was responsible for dealing with outside counsel and regulatory agencies.

19. Awerdick initially advised MBC that the laws of nine states could be read to bar the "everybody wins" approach used by MBC, that sweepstakes were increasingly being regulated by state prize and gift laws, and that risk assessment was difficult because the laws were not being heavily enforced. He also advised MBC that certain states required disclosure of the odds of winning or of prize value and regulated the use of "specially selected" and similar language. Awerdick subsequently assisted MBC in responding to inquiries from regulatory agencies and consumers concerning its sweepstakes promotions.

20. By the spring of 1992, MBC had established a procedure for developing new promotions in which each proposed promotion was reviewed by Awerdick at two different stages. If Awerdick advised MBC not to send a particular mailing out for some reason, the mailing was not sent out.

21. In connection with the due diligence of MBC by F & G in 1992, Pellegrino knew that "some states didn't like" the

"everybody wins" sweepstakes used by MBC, and were discussing eliminating "everybody wins" sweepstakes. Pellegrino understood an "everybody wins" sweepstakes to include sweepstakes mailings where everyone that returns an entry wins a prize. Nonetheless, F & G "did not see anything that disturbed" them with respect to MBC's sweepstakes, including the "everybody wins" promotions.

22. In August 1992, Regal received a memorandum in connection with F & G's due diligence of MBC that listed "Increased state regulation of sweepstakes C first round winner" as a global concern to MBC's business. Regal explained this global concern as meaning that each state had different sweepstakes rules and, if those rules varied from state to state, MBC could have difficulty making mailings on a cost efficient basis, such that increased state regulation on what could be put in a catalogue on sweepstakes could have an effect on MBC's business.

23. MBC's dependency on sweepstakes was also considered a possible "threat" to its business. According to Regal, this meant that changes in state laws could prevent MBC from mailing its sweepstakes promotions into those states.

24. In August 1993, Awerdick advised MBC about pending sweepstakes legislation in Illinois, and advised that the Illinois legislation was not the only new law in the area nor the last that would pass. Awerdick had already advised MBC about new laws in Georgia and Arkansas, and promised to update MBC on legislation in Minnesota, Nebraska, Wyoming, Tennessee and perhaps other states which might affect sweepstakes.

25. In a letter dated February 23, 1994, to F & G's accountant, Price Waterhouse L.L.P., with copies to F & G and MBC representatives, Awerdick referred to "unasserted claims" and then advised that promotional sweepstakes were regu-

lated directly or indirectly in all fifty states, as well as under federal law, and that "[t]rends in the regulation of sweepstakes are noteworthy." Awerdick's letter went on to state:

> Increasingly, states are using consumer protection laws to regulate sweepstakes further. In particular, a number of states are regulating some promotions in which every recipient of a mailing is advised that he or she is a prize winner. Many of the Company's [MBC and Flower of the Month Club, Inc.] mailings include such a statement. Generally, either through statutory language or as a matter of prosecutorial discretion, these "gift and prize" laws are being applied against businesses using "900" telephone numbers, offering time shares, vacation homes and camp sites, or requiring attendance at a sales presentation to receive a prize. I know of no current attempts to enforce these laws against traditional conventional direct mail sweepstakes operators. However, the Company would be required to make fundamental changes in many of its mailings if a "prize and gift" statute were applied to the "everybody wins" element of its promotions, Michigan Bulb's management has been advised of the risks raised by these state statutes.

Sweepstakes dependency and governmental regulation were not noted as material risks to MBC either by Awerdick, or in Price Waterhouse's audited financial statements for that year.

26. Awerdick wrote a similar letter to Price Waterhouse dated February 22, 1995. That letter contained a paragraph substantially similar to the passage quoted in the foregoing paragraph, except that the February 22, 1995, letter deleted the sen-

tence, "I know of no current attempts to enforce these laws against traditional conventional direct mail sweepstakes operators," which had been included in Awerdick's 1994 letter because by that time, MBC had received a sweepstakes inquiry from the North Carolina Attorney General. Awerdick also indicated that there was a trend among states to use consumer protection laws to regulate sweepstakes, particularly where businesses were using 900 numbers, offering time shares, vacation homes, camp sites, or required attendance at a sales presentation to win a prize. Awerdick advised MBC of these risks, but never advised MBC to stop using "everybody wins" promotions or warned that any required changes would result in a significant adverse financial impact for MBC. Again, sweepstakes dependency and governmental regulation were not noted as material risks to MBC either by Awerdick, or in Price Waterhouse's audited financial statements for that year.

### Attorney General Inquiries

27. MBC, like other mail order companies, regularly received inquiries from third parties, such as Attorneys General, Better Business Bureaus, and Action Lines. In fact, MBC received 5,769 inquiries from such third parties in 1992, 3,269 in 1993, 4,413 in 1994, and 3,326 in 1995.

28. MBC's president, Ostertag, reported to Pellegrino. Pellegrino talked with Ostertag three to four times a week, and knew of inquiries from state attorneys general.

29. Dale Fujimoto ("Fujimoto"), MBC's Senior Vice President of Marketing, testified that these inquiries amounted to less than 1% of the approximately 17 million promotions that were mailed by MBC during these time frames and were routinely handled in the normal course of business. These inquiries were considered to be a routine part of the direct mail order business and were not viewed as a matter of concern to either MBC or F & G management.

30. In and before 1995, MBC had responded to inquiries regarding sweepstakes from the attorneys general of Arkansas, Indiana, Iowa, Maryland, Michigan, Nebraska, North Carolina and Oregon. Many of those inquiries involved MBC's "everybody wins" promotions. Other inquiries involved disclosure of the odds of winning in connection with MBC's sweepstakes promotions.

31. Specifically, the inquires received by MBC in and before December 1995 included:

a. Inquiries from the Arkansas Attorney General's Office in April 1992 and June 1993 regarding the Arkansas Mail and Telephone Consumer Product Promotion Fair Practices Act.

b. A December 1, 1994, inquiry from an Assistant Attorney General with the Consumer Protection Section of the North Carolina Department of Justice asserting that various representations in MBC's mailing were deceptive and that the "everybody wins" element of MBC's mailing violated North Carolina law.

c. An August 18, 1995, inquiry from the Maryland Attorney General's office regarding a notification which gave the impression that the recipient was the winner of a sweepstakes and attached a copy of Maryland's Consumer Protection Act which prohibited certain solicitations.

d. On September 22, 1995, Awerdick responded to a consumer complaint from the State of Michigan by advising Stumb that they "need to discuss the piece involved too. It is an old one which refuses to die but may need the assistance of Michigan's most notable forensic physician (the honorable Dr. K.)." Stumb understood the reference to "Dr. K" to refer to Dr. Kevorkian, known as

the death doctor. After a meeting with two representatives of the Michigan Attorney General's office in June 1996, MBC's Stumb agreed that that particular solicitation was "misleading and cannot be defended."

e. An October 4, 1995, inquiry from the Indiana Attorney General's office, stating that MBC "may have violated" the state's Promotional Gifts and Contests Act and requesting that MBC agree to enter into an Assurance of Voluntary Compliance.

f. On October 11, 1995, the Iowa Department of Justice wrote to MBC, suggesting that MBC's solicitation sent to an Iowa consumer did not comply with Iowa's Prize Notification Law and requesting that MBC immediately discontinue use of all prohibited solicitations in Iowa.

g. On December 14, 1995 the State of Nebraska Attorney General issued a Civil Investigative Demand to MBC. The demand was received by MBC on December 19, 1995.

32. To a casual observer lacking the context that was provided during the trial, this list of inquiries might well appear ominous, and it might seem that the officers and directors of F & G were negligent for not having been more concerned about these inquiries. However, it is important to note that none of these inquiries ultimately led to any enforcement action against MBC or otherwise had a material financial impact or other adverse consequences on MBC. These inquiries were each resolved without further action after MBC's Attorney Awerdick provided additional information indicating why MBC believed that its practices were either exempt from or not in violation of state law. The resolution of such inquiries was considered to be a routine part of the mail order business.

33. Defendants' sweepstakes expert Stephen Durchslag ("Durchslag"), an attorney at a reputable Chicago law firm with many years of experience in the field, provided credible and unrefuted testimony that while the inquiries received by MBC in 1995 did need to be addressed, sweepstakes law experts would not have considered them to have been serious or an indication that MBC was at risk of substantial regulatory or enforcement problems. Rather, the receipt of consumer contacts and letters of inquiry from state attorneys general following up on consumer complaints is par for the course in the sweepstakes marketing industry, and the frequency of the inquiries received was not surprising given the large number of customer contacts distributed by MBC. Durchslag also testified that the sweepstakes and regulatory issues that were experienced by MBC prior to December 20, 1995, were not material at that time and that his answer would remain the same even if the time frame were expanded to include the inquiries which were formally resolved by voluntary assurance or settlement with the states of Michigan, Connecticut, and Vermont in the years that followed.

34. Plaintiffs offered the expert testimony of Professor Charles Linke ("Linke"), a retired professor of finance and business finance/investment consultant, that during the course of his engagement for this litigation, he asked a librarian to perform a computer database search for articles involving sweepstakes. Several of those articles were admitted into evidence at trial. Although Linke thought that some reference to sweepstakes risk should have been included in Houlihan's valuation as part of an inquiry into whether MBC could sustain its record of profits over time, he could not say that, given the literature available and knowledge of MBC's record of profits, F & G manage-

ment should have foreseen that the company would fail in 1998. Linke also conceded that from his review of the literature, it appeared that states were not trying to eliminate sweepstakes marketing, but rather trying to establish some regulations to address deceptiveness, and no one in 1995 predicted the total collapse of the sweepstakes market. Durchslag echoed the observation that the collapse of the sweepstakes marketing industry that occurred in 1998 was not foreseeable in 1995.

35. Given the fact that in 1995, experts in the industry did not foresee the collapse of the sweepstakes marketing industry, it would be unreasonable to suggest that F & G's officers and directors should have been able to predict that the sweepstakes marketing industry would collapse or encounter serious problems in the foreseeable future.

36. Plaintiffs' experts Linke, Wolski, and James Hitchner ("Hitchner") suggested that because there were some articles about sweepstakes issues in newspapers, periodicals, trade journals, everyone involved in the ESOP II transaction should have known that sweepstakes posed a material risk to F & G. However, while these articles are certainly part of the historical mosaic of what the realities were in 1995, many of the articles did not address the marketing practices used by MBC. Durchslag noted this distinction in his testimony, describing the news articles as insignificant to the industry and mostly addressing marketers who were not actually selling products, telemarketer abuses, and instances of outright fraud. Defendants' valuation expert, Robert Reilly ("Reilly"), also performed industry research and noted that the articles in existence prior to December 20, 1995, were largely from the general press, which he considered to be less reliable than industry journals, as well as the fact that many of the articles were not specifically relevant to F & G or businesses like it.

37. Plaintiffs did not offer expert testimony on the important point of a contemporaneous observation of trends within the sweepstakes marketing industry or the state of the industry itself in 1995, which is the key inquiry here, as the Court must determine what was and was not a material risk in December 1995, hopefully without simply relying on the distorting effects of hindsight. Defendants' expert, Durchslag, was the only legal expert witness presented at trial who was actively involved in the sweepstakes marketing industry in December 1995 and the preceding years; he testified to the state of the industry based on his personal involvement and experience.

38. Durchslag testified that sweepstakes had been a legitimate and important part of a promotional mix to involve and reach customers since 1890. He indicated that MBC's use of fictional names on customer communications, which was repeatedly criticized by Plaintiffs at trial, was an accepted practice in the industry to avoid privacy intrusions for the customer service representatives and provide continuity over time.

39. Unlike Plaintiffs' experts, Durchslag was truly an expert in the field of sweepstakes marketing at the time of the 1995 transaction and was not testifying based on recent research attempting to recreate the state of the industry with the benefit of hindsight. Consequently, his testimony was more credible.

40. Given this expert testimony, the Court cannot find that there was anything about the frequency or nature of customer or third party inquiries that either caused or should have caused F & G to have been on notice of a present or future material risk associated with its sweepstakes marketing. The Court must also conclude that

at the time of the 1995 transaction, there was no material risk to F & G resulting from either MBC's sweepstakes dependency or government regulation of the direct mail/sweepstakes marketing industry.

### Annual ESOP Valuations by Valuemetrics

41. Valuemetrics, Inc. ("Valuemetrics") performed an annual valuation of F & G shares for the ESOP every year from 1988 through 1994.

42. Valuemetrics determined that the fair market value of the capital stock of F & G was $99.7 million on a marketable minority basis as of December 31, 1992. At that time, MBC was separately valued at $21 million on a minority basis

43. Valuemetrics determined that the fair market value of the capital stock of F & G was $117 million on a marketable minority basis as of December 31, 1993. At that time, MBC was separately valued at $34 million on a minority basis.

44. Valuemetrics determined that the fair market value of the capital stock of F & G was $162 million on a marketable minority basis as of December 31, 1994. According to Valuemetrics, F & G had increased in value by about $45 million, or 38%, in 1994. Although Valuemetrics did not separately value MBC, MBC's projected operating income was about 50% of F & G's total projected operating income for 1994 through 1999.

45. In 1995, MBC accounted for about 61% of F & G's total earnings.

### The 1995 Stock Purchase Transaction

46. Foster learned in the summer of 1994 that he was dying and took steps to get his estate in order and to provide for the transition of the management of F & G.

47. Valuemetrics, which had been retained as a financial advisor with the 1988 ESOP and had since conducted the year-end stock valuations for Magna Bank as the ESOP trustee, was asked to determine what options were available for liquidating a portion of Foster and Regal's stock, as well as possible strategies for ownership transition. Valuemetrics analyzed several alternatives, including bringing in a new shareholder to purchase shares from Foster and Regal or selling the company to a strategic third party buyer, an initial public offering ("IPO"), and a second ESOP. The stated goals of Foster and Regal were to provide at least 50% immediate liquidity of their F & G stock and to maximize the present value of their after-tax proceeds received from the sale of the stock and their residual shares of F & G stock. The stated goals of F & G were to maintain adequate operating cash flows to allow the pursuit of other acquisitions and investment opportunities, to broaden the ownership of its stock to its employees, and to provide sufficient financial incentives for key employees to successfully manage the company. Valuemetrics estimated that F & G could take on an additional $75 million in debt and still maintain its working capital requirements.

48. Foster expressed a concern that F & G's "present corporate product lines, and their attendant sales and profits, will not likely make desirable disclosure fodder" for an IPO but also expressed a desire for F & G to continue as a viable legacy business in a closely-held, private company. At trial, Plaintiffs suggested that Foster's comment was an early explanation of a later effort to conceal information regarding MBC's sweepstakes marketing practices. However, the credible weight of testimony established that the comment was an acknowledgement that F & G's primarily mail-order horticultural business was not glamorous or "sexy" enough to spark the public interest necessary to make an IPO successful.

49. Valuemetrics recommended the $70 million leveraged ESOP from among the various alternatives, because it met the most objectives of any option. The board also concluded that the ESOP transaction was the only option that would guarantee that Foster & Gallagher as they knew it would not be liquidated, restructured, or relocated to another part of the country by a new owner, potentially leaving its employees jobless.

50. In early 1995, Foster, Regal, Pellegrino and others began a series of meetings to plan ESOP II. In March 1995, Attorney Joseph Z. Sudow ("Sudow"), of Kavanagh, Scully, Sudow, White & Frederick, P.C. (the "Kavanagh Firm"), who was F & G's corporate attorney, advised Foster and Regal that for a re-leveraged ESOP II, they should think in terms of an amount of leverage that would not affect F & G's ability to generate enough cash to service the debt obligation. Sudow further advised Foster and Regal that "ERISA generally provides that a fiduciary (which could include not only the trustee, but officers, directors and control shareholders) shall discharge his or its duties solely in the interest of the participants and beneficiaries and 'for the exclusive purpose of providing benefits to participants and beneficiaries and for defraying reasonable expenses of administering the plan . . . .' "

51. For purposes of the ESOP II transaction, Sudow and the Kavanagh Firm represented Foster and Regal personally. Other counsel, namely Mayer, Brown & Platt, was retained to represent F & G in the transaction.

52. On March 16, 1995, Valuemetrics offered to assist the ESOP administrative committee and F & G's board of directors in outlining and reviewing the significant elements of a subsequent sale or sales of stock to the ESOP. By March 23, 1995, Foster had told Dickes, F & G's Executive Vice President, to go ahead with the Valuemetrics proposal.

53. In May 1995, Valuemetrics formally issued its ESOP valuation of F & G as of December 31, 1994, for which all of the substantive work had been completed prior to the end of 1994. In this valuation, Valuemetrics determined that the fair market value of F & G capital stock was $162 million on a marketable minority basis.

54. By the time the valuation formally issued, Valuemetrics was also consulting with F & G about ownership transition strategies and the expanded use of the ESOP as a means of achieving the desired purchase or liquification of the stock holdings of the selling shareholders, including Foster and Regal. Based on the assumption that the shareholders wanted liquidity in the near term and for F & G to remain healthy and viable, Valuemetrics concluded that: (1) a large leveraged ESOP ($50–70 million) or a recapitalization would meet those goals; (2) an ESOP of this size would be able to acquire a significant number of shares but would not be able to buy all of the remaining shares; (3) the selling shareholders could take advantage of favorable tax treatment; (4) a recapitalization would allow the shareholders to sell their entire interest but would result in capital gains tax; and (5) an initial public offering ("IPO") of the stock would be less desirable because the market might restrict the amount of shares the controlling shareholders could sell as part of the IPO.

55. Given the primary goals of these shareholders, Valuemetrics found a leveraged ESOP transaction and a recapitalization or sale of F & G to a strategic buyer to be "far superior" options.

56. Concerned that Magna Bank did not have the necessary expertise and sophistication to manage the ESOP II transaction or continue as trustee once

the ESOP became the majority shareholder of F & G, in June 1995, the F & G Board solicited recommendations from Valuemetrics for an experienced institutional trustee to assist them. Due to the sophistication of the proposed transaction, Valuemetrics recommended LaSalle Bank, U.S. Trust, and State Street Bank & Trust as trustees.

57. In 1995, Norman Goldberg ("Goldberg") was the manager of U.S. Trust's Washington, D.C. office and acted on behalf of its Special Fiduciary Committee when U.S. Trust served as an institutional trustee for transactions involving ERISA issues. Prior to joining U.S. Trust, Goldberg had held several positions relating to fiduciary duties under ERISA plans, including eight years supervising most of the ERISA litigation brought by the Secretary of Labor. Only a few firms and investment brokers provide this kind of specialized service.

58. In late June 1995, Goldberg sent Sudow a letter and copies of articles that described U.S. Trust's services. According to the materials provided by Goldberg:

a. Fiduciaries of employee benefit plans that acquire and hold employer securities are required to make investment decisions that are often financially complex and are made more difficult by the conflicts typically inherent in such transactions by virtue of management and/or other "insider" involvement.

b. The "standards under which independent fiduciaries are expected to act are in many respects complex, requiring the close scrutiny of experienced professionals who are involved in the difficult business of investment decisions on a day-to-day basis."

c. ERISA generally holds fiduciaries to a higher standard than imposed on fiduciaries under the common law, and the standard of scrutiny is at its highest level when a fiduciary is acting on behalf of a leveraged ESOP.

d. An independent fiduciary acting on behalf of an employee benefit plan in a transaction involving employer securities should perform a diligent and objective review of all relevant facts and also assure that all information on which judgments will be based is current.

e. The extent to which a fiduciary may properly rely on the opinion of a financial advisor depends on whether material information exists that would render the opinion invalid or unreliable, and on the reasonableness of forecasts on which the valuation is based.

59. In June 27, 1995, Lyle T. Dickes ("Dickes"), F & G's Executive Vice President, distributed an Interoffice Memo to Regal, Foster, Pellegrino and others about the discussion agenda for "Norman Goldberg's–U.S. Trust visit."

60. On June 28 and 29, 1995, Goldberg traveled to Peoria and met with Foster, Regal and others in F & G's board room. Goldberg described the meeting as "a fairly expansive discussion." Goldberg engaged "in a lengthy conversation about Foster and Gallagher, its history, the reasons for the transaction, the nature of the business, their expectations" to get a clear understanding of the company. MBC was described as a "meaningful part of the company," and Goldberg understood where MBC fit into F & G's tradestyles and that it had a sweepstakes component. F & G management, including Regal and Pellegrino, also interviewed Goldberg about his and U.S. Trust's experience with ESOP and ERISA matters.

61. In a telephone call on June 30, 1995, Goldberg advised Dickes that U.S. Trust's fee for the proposed transaction would be $75,000. Goldberg also advised that the expected range of cost for legal

fees in connection with the transaction would be from $40,000 to $60,000.

62. By July 5, 1995, F & G had reached an agreement with U.S. Trust for its fee schedule regarding the contemplated ESOP transaction, which included fees for the transactional decision and a three-month period of follow-up services as the independent fiduciary.

63. In July 1995, Valuemetrics issued another valuation, reporting that as of July 20, 1995, the value of F & G stock on a control basis was $229.2 million.

64. In July 1995, Sudow proposed to Foster, Regal and Pellegrino "that Pelle[grino], Lyle [Dickes], Fred [Stuber, F & G's Senior Vice President of Finance and Secretary] and Mike [Norbutas, F & G's Treasurer] be out in front as the committee that carries out the instruction from the Board [implementing ESOP II] (so that there is no apparent conflict of interest on the part of Tom [Foster] and Mel [Regal] )." Regal understood that because of the conflict of interest referred to by Sudow, Regal and Foster should not be part of the due diligence if the ESOP II transaction proceeded.

65. On August 28, 1995, U.S. Trust entered into an engagement letter with Sonnenschein, Nath & Rosenthal (the "Sonnenschein Firm") to confirm the terms and conditions on which the firm would represent U.S. Trust with respect to the proposed transaction.

66. Goldberg met with F & G representatives in Chicago on August 28, 1995, to further discuss the proposed transaction. On August 30, 1995, Goldberg wrote to Regal to confirm the understanding and agreement between F & G and U.S. Trust "with respect to certain professional services to be provided by U.S. Trust to the Foster & Gallagher, Inc. Employee Stock Ownership Plan and related Trust established by the Company (collectively, the 'Plan')." Among other things, the letter stated:

1. Foster and Gallagher, Inc. (the "Company") desires to retain U.S. Trust Company of California, N.A. ("U.S. Trust") as the independent trustee of the Foster & Gallagher, Inc. Employee Stock Ownership Plan (the "ESOP") in conjunction with a possible purchase of Company stock by the ESOP and related actions (hereinafter collectively referred to as the "Proposed Transaction").

2. It is understood that in exercising its responsibilities pursuant to this Agreement, U.S. Trust will rely on the written opinion of the Plan's independent financial advisor that (i) the consideration to be paid by the Plan is not in excess of "adequate consideration" within the meaning of Section 3(18) of ERISA; (ii) the Proposed Transaction is fair and reasonable to the Plan from a financial point of view; and (iii) the terms and conditions of the acquisition loan are fair and reasonable to the ESOP from a financial point of view (the "Financial Opinion"). If for any reason the Financial Advisor does not provide the Financial Opinion in form satisfactory to U.S. Trust at or prior to the Closing, U.S. Trust will not be required to make a final determination whether to participate in the Proposed Transaction. Although the fees and expenses incurred by U.S. Trust pursuant to this Agreement will be paid by the Company, it is understood that U.S. Trust's sole professional responsibilities are to the Plan and the Plan Participants.

3. The Company will furnish or cause to be furnished to U.S. Trust or its Financial Advisor all current and historical financial and other information regarding the Company requested by U.S. Trust to perform its obligations hereunder. The Company represents

that the information which it provides will be accurate and complete in all material respects to the best of its officers' knowledge and it is understood that U.S. Trust will rely on the accuracy of that representation to carry out its responsibilities pursuant to this Agreement.

The engagement letter also included a provision indemnifying U.S. Trust from liability unless U.S. Trust was found to have acted negligently. On August 31, 1995, Dickes signed the engagement letter with U.S. Trust on behalf of F & G.

67. Regal had met with representatives of Houlihan, Lokey, Howard & Zukin ("Houlihan") in June 1995. On July 10, 1995, before U.S. Trust had been engaged to act in connection with the 1995 ESOP II transaction, Houlihan wrote to Regal to confirm that Houlihan would provide a fairness opinion for the proposed transaction for a fee of $35,000. The letter went on to say that when the transaction was defined and the trustee determined, Houlihan would send an engagement letter.

68. In late September 1995, U.S. Trust entered into an engagement letter with Houlihan. Houlihan was engaged to provide assistance in evaluating the transaction from a financial perspective and to render a written opinion to U.S. Trust as to whether the proposed stock transaction was fair to the ESOP from a financial point of view for a fee of $35,000. The engagement letter provided that although Houlihan would report solely to U.S. Trust, F & G would pay Houlihan's fees and expenses. Further, Houlihan would use, rely on, and assume the accuracy of, "without independent verification, data, material, financial forecasts and projections and other information with respect to the Company [F & G] and its agents, counsel, employees and representative[s]." There is no claim in this case that Houlihan was in any way unqualified to serve as the financial advisor to U.S. Trust, and it is undisputed that Regal and Pellegrino understood that Houlihan was a nationally recognized financial advisor with substantial ESOP expertise.

69. On September 30, 1995, Valuemetrics issued its first transaction memorandum to the F & G board of directors describing a proposed offer to sell 2,916,-667 shares to the ESOP at $24.00 per share. Valuemetrics noted that the memorandum included certain statements, including projections, with respect to the anticipated future performance of F & G and cautioned that: (1) such statements were based on various estimates and assumptions by F & G, which estimates and assumptions might or might not prove to be correct; (2) although the projections contained therein had been prepared with significant good faith input from F & G's management, such projections involved significant elements of subjective judgment and analysis and would be materially different if different estimates and assumptions were employed; and (3) no representation was made as to the accuracy of any such statements, and there could be no assurance that the projected results would be obtained.

70. Pellegrino provided background information to Valuemetrics, and approved "top line" financial information provided to Valuemetrics. Pellegrino reviewed the projections with Regal, and Foster also looked at the projections. Regal reviewed the projections, and understood that Valuemetrics, U.S. Trust and Houlihan were relying on the projections provided by F & G management.

71. The ESOP II transaction as initially proposed can be summarized as follows: (1) F & G's board of directors would authorize the conversion of the current Executive Incentive Plan ("EIP") from a book value basis to a market value basis, which

would create a significant income tax benefit to F & G; (2) F & G's management employees would have the opportunity to exercise 527,141 EIP options at an average exercise price of $4.60 per share; (3) of the 2,916,667 total shares offered to the ESOP, 1,790,243 shares would be offered on a pro-rata basis from Foster and Regal, and 1,126,424 shares would be offered by management, either through the sale of existing shares or through the exercise of options granted as part of the EIP; and (4) those employees who sold shares to the ESOP would have an opportunity to purchase, on a pro-rata basis, 626,858 newly issued, restricted shares at market value. Following this transaction, the ESOP would have a majority ownership interest in F & G.

72. On October 6, 1995, Regal sent a confidential interoffice memo to Foster, Pellegrino and others, advising that on Tuesday, October 17, 1995, Goldberg and Michael Shea ("Shea") of U.S. Trust and Martin Sarafa ("Sarafa") and Todd Strassman ("Strassman") of Houlihan would be at F & G to perform due diligence regarding the ESOP II transaction. Regal advised that Goldberg, Shea, Sarafa and Strassman would want to spend about forty-five minutes with the heads of the various functional areas, and asked the recipients to keep their time flexible that day.

73. On October 17, 1995, Goldberg, Shea, Sarafa, and Strassman met with executives of F & G to perform due diligence regarding the ESOP transaction. They met with Regal, Pellegrino, Frederick Stuber ("Stuber"), Dickes, Sudow, Ostertag, and others a various times for most of the day. Regal, Pellegrino, Dickes, Ostertag, and Stuber each sold shares to the ESOP on December 20, 1995.

74. Ostertag, who was then President and CEO of MBC and later became President and CEO of F & G, was involved in the meetings with Houlihan and U.S. Trust on October 17, 1995. Ostertag gave an overview of MBC, including an explanation of changes that he had made since becoming president in 1992 and strategies for the future of the company. He also discussed some risks to the business, including increased postage rates, Department of Agriculture regulations, and competition from Wal–Mart and other mass retailers entering the horticultural market.

75. Goldberg recalls a discussion that day with Ostertag involving MBC and its sweepstakes marketing. Ostertag discussed "the success and general role that sweepstakes played in" MBC. Ostertag also discussed that MBC's average customer was over fifty years of age, with an average income of about $35,000, with a high school education, and "tied to sweepstakes." Ostertag described MBC's business as marketing driven, in comparison to the other F & G businesses which were merchandise driven, and noted MBC's desire to develop other promotions as part of an overall strategy to diversify and broaden its customer base.

76. MBC's mailings to its "house file" of past customers had increased from twenty to twenty-six to thirty-four promotions per year. Ostertag told Goldberg that MBC had "started ramping up circulation" in 1995. Ostertag related that from January to June 1996, MBC expected to mail 17 million sweepstakes pieces. MBC was beginning to try to sell more and different products, like jewelry and comforters, to its house file.

77. Ostertag was asked about risks associated with MBC's business and responded that MBC's management does not put the business at risk. Ostertag said that retail competitors like Wal–Mart and K–Mart were a risk but that those retail competitors could not compete, that postage factors were a small problem, and that MBC needed new names for mailing lists.

78. At the October 17, 1995, meeting, Ostertag did not identify government regulation of sweepstakes as a risk. Nor did any other F & G representative identify either dependency on sweeps or possible government regulation of sweepstakes as a risk to MBC during the October 17, 1995 meetings. There was no discussion that MBC's dependency on sweepstakes was a negative. There was no discussion about any pending attorney general investigations into MBC's sweepstakes marketing, and no discussion regarding state laws that regulated MBC's sweepstakes marketing. F & G representatives did not give Houlihan any reason to believe that there were any negative issues relating to MBC's sweepstakes.

79. During the October 17, 1995, meeting, Regal told Sarafa and Strassman that the key to MBC was sweepstakes, that sweepstakes would be the key to new product growth, and that normally sweepstakes do not generate loyal customers. The gist of Regal's comments was that MBC would continue to use sweepstakes and that sweepstakes would be one of the keys to driving the future growth of MBC.

80. Credible testimony from F & G officers indicated that state regulation and sweepstakes issues were not considered to be material at any time prior to the ESOP II transaction.

81. While exact percentages of revenue may not have been known, the U.S. Trust team was well-aware that MBC was a major profit center for F & G and that MBC used sweepstakes marketing as its primary sales tool.

82. During this meeting, Shea recalls being provided with a number of MBC catalogs, but it was more for him and Goldberg to see the various types of catalogs and offerings so they could better understand the overall business. Shea does not recall anything specifically about the sweepstakes solicitations he saw that day.

83. Ostertag took Shea on a tour of MBC's facilities in Grand Rapids on October 18, 1995. Ostertag testified that Fujimoto, Stumb, and Dave Grimm, MBC's senior vice presidents, accompanied them on the tour. The tours that MBC provided typically included the mail room, customer service, and data entry, as well as an area in which the creative department was located. Ostertag does not remember any discussions with Shea on October 18, 1995, regarding sweepstakes, and does not recall Shea asking to review any of MBC's files.

84. Shea does not specifically recall the individuals he met with in Grand Rapids on October 18, 1995. He does recall receiving an explanation of how one organizes a catalog, but does not specifically recall anything else about the meetings in Grand Rapids. Shea does not recall any discussions on October 17 or 18, 1995, regarding any pending regulatory investigations into MBC's sweepstakes marketing or the number of customer complaints that MBC received with respect to sweepstakes marketing.

85. On the record presented at trial, the Court cannot find that Foster, Regal, or Pellegrino attempted to conceal information or make less than full disclosure to the U.S. Trust team either in connection with the October 1995 meeting or at any other time leading up to the transaction. The evidence indicated that Regal and other F & G officers directed F & G employees to provide all information requested by the U.S. Trust team, and they were never informed that the U.S. Trust team had been denied access to any information or had met with any resistance.

86. During roughly the same time frame, B.A. Securities, a subsidiary of Bank of America corporation, conducted

its own diligence of F & G and issued a private placement memorandum for potential lenders in the prospective ESOP transaction. The memorandum stated that F & G intended to issue a $70 million loan to the ESOP for the purpose of financing the ESOP's purchase of stock from existing shareholders and sought a corresponding loan from institutional lenders. Although the memorandum stated that F & G was subject to Federal Trade Commission regulations governing advertising and trade practices, it did not identify sweepstakes as an inherently risky promotional tool or identify any legal or regulatory sweepstakes risk. By November 20, 1995, BA Securities had successfully located four institutional lenders, including two lenders from the 1988 ESOP transaction, who, in combination, were willing to loan F & G the requested $70 million on favorable terms (e.g., no collateral and at a low interest rate) that were acceptable to F & G.

87. Ostertag had mentioned during the meeting with U.S. Trust and Houlihan that MBC did have a strategic plan document that had been prepared in August 1995, but Shea and Goldberg did not review any MBC strategic plans during that meeting. Rather, some time between the meeting and the closing of the transaction, Goldberg and Shea received MBC's 1996–1998 strategic plan. Both Sarafa and Strassman also received and reviewed MBC's 1996–1998 strategic plan.

88. MBC's 1996–1998 strategic plan included prioritized lists of threats for each of MBC's business units. Those threats included governmental regulation and dependency on sweepstakes, among others. Testimony from F & G and MBC officers at trial consistently and credibly indicated that the reference to governmental regulation was not a specific concern with respect to sweepstakes but rather involved the regulatory oversight applicable to MBC as a direct mail marketer of horticultural products and the effect that increased privacy regulations would have on MBC's ability to use mailing lists and its customer database in particular. Dependency on sweepstakes was explained as a general need to diversity MBC's marketing strategies to reach a broader customer base. Sarafa and Goldberg both testified that they had the same understanding of these "threats" based on the presentations given on October 17, 1995.

89. A comparison of MBC's 1996–1998 strategic plan to previous planning documents reveals that governmental regulation and dependency on sweepstakes had moved several places down on the prioritized list of threats, having been replaced by concerns about increasing paper and postage costs. From 1993 to 1995, when the 1996–1998 strategic plan was drafted, governmental regulation had dropped from number three to number four in priority, while dependency on sweepstakes had plummeted from number one in priority to number five.

90. After they received and reviewed MBC's strategic plan, Sarafa and Strassman did not ask anyone what the threat of "governmental regulation" meant, because Sarafa understood that the threat of "governmental regulation" was primarily related to privacy, and did not have any understanding it included sweepstakes concerns.

91. Goldberg would have seen MBC's 1996–1998 strategic plan and would probably have read it through before December 20, 1995. Goldberg understood the threat of governmental regulation to refer to privacy issues.

92. Shea did not have any discussions with anyone from F & G on or before December 20, 1995 regarding the governmental regulation or dependency on sweepstakes threats mentioned in MBC's strategic plan.

93. On October 19, 1995, Goldberg contacted Dickes and informed him that both U.S. Trust and Houlihan were skeptical of the $24.00 share price derived by Valuemetrics and requested that any due diligence material sent to Houlihan also be sent to U.S. Trust.

94. After assimilating the information received from F & G into its analysis, Houlihan presented U.S. Trust with a quantitative analysis of F & G's financials versus the offer price of $24.00 per share. As was its normal practice, U.S. Trust did not disclose this quantitative analysis to any F & G shareholder, so as not to impair its bargaining position. After reviewing Houlihan's quantitative analysis, U.S. Trust determined that Valuemetrics' analysis was optimistic in certain respects and instructed Houlihan to prepare a new analysis which reflected a lower valuation range for the shares. For the same reasons, U.S. Trust also did not provide a copy of this new analysis to any F & G shareholder.

95. On October 26, 1995, Valuemetrics issued an Analysis of Value for the ESOP purchase in which it concluded that the value of F & G as of October 24, 1995, ranged from $298.5 to $311.4 million on a marketable control basis. Valuemetrics' analysis did not take into account any risk associated with MBC's sweepstakes marketing.

96. At a meeting on October 26–27, 1995, the F & G board adopted a resolution approving the concept for the proposed $70 million ESOP II transaction and authorizing the officers of F & G to take all steps necessary and proper to bring about the completion of the transaction with such changes as the F & G's executive committee might deem necessary and proper and final approval of F & G's board as to the price to be paid to the selling shareholders by the ESOP trust. The members of F & G's executive committee, which consisted of Foster, Regal, and Pellegrino, were authorized to approve changes to the proposal.

97. At the same meeting, F & G's board was advised that MBC had received three new sweepstakes inquiries from Indiana, Iowa and Maryland in October 1995. Again, these were seen as routine inquiries and not a reason for concern.

98. Magazine Marketplace, Inc. ("MMI") was F & G's magazine subscription agency that marketed subscriptions through direct mail using a $7 million top prize sweepstakes as its primary promotional tool. On November 2, 1995, F & G announced the closure of MMI, which had been contemplated for some period of time. Although a memo announcing the closure made reference to "changes in the stampsheet/sweepstakes business" having "a very negative effect on the magazine agency business," the evidence at trial established that the closing was largely due to MMI's inability to profitably compete in the stampsheet business and the unavailability of names for future mailing lists.

99. During the due diligence for the ESOP II transaction, Goldberg, Shea, Sarafa, and Strassman were all aware that MMI was being closed.

100. In conducting their review of the proposed transaction, Houlihan and U.S. Trust considered F & G's ability to service the $70 million corporate debt created to finance the 1995 ESOP transaction and the effect of that debt on the value of F & G stock. Houlihan and U.S. Trust concluded that F & G would remain viable and be able to service the debt.

101. Defendants' expert James Ahstrom, a former investment banker who specialized in leveraged ESOP transactions, testified that he applied standard measures used in the investment community for determining a company's ability to ser-

vice debt to F & G's financial data at the time of the transaction and determined that those measures indicated that F & G would be fully capable of servicing the additional debt incurred in the 1995 ESOP transaction.

102. No expert testimony challenging the conclusions reached by Houlihan, U.S. Trust, or Ahstrom with respect to F & G's ability to service its debt following the 1995 ESOP transaction was presented at trial.

103. Price negotiations involving F & G, U.S. Trust, Valuemetrics, and Houlihan continued during the month of November 1995. U.S. Trust communicated to F & G that its valuation range was below the $24.00 offer price, and a conference call was arranged for November 7, 1995, to discuss the differences in the two valuation analyses.

104. Despite Valuemetrics' efforts to persuade U.S. Trust of the merits of its valuation, U.S. Trust reiterated to some members of F & G management in a subsequent conference call that it was still unconvinced that the $24.00 valuation was appropriate. In order to allow some room for negotiation, U.S. Trust suggested a share price of $18.50, which was at or near the low end of the Houlihan's value range. U.S. Trust believed this to be a conservative price that would allow some negotiation leeway before approaching the $19.81 per share midpoint of Houlihan's estimated fair market value.

105. Foster and Regal were extremely unhappy with U.S. Trust's offer. They summarily rejected the $18.50 offer price and negotiations broke off. Because of the disparity between the price that U.S. Trust was willing to approve and the price the selling shareholders were willing to accept, serious doubt existed as to whether the transaction would actually go forward.

106. Several days later, talks resumed and by November 29, 1995, the parties tentatively agreed to a price of $19.50 per share subject to further due diligence by U.S. Trust and the completion of appropriate documentation. Although the selling shareholders did not know it at the time, this $19.50 share price was less than the midpoint of the value range determined by Houlihan for the F & G shares.

107. The $19.50 purchase price represented a considerable increase in value over the $8.57 per share that the ESOP's appraiser determined to be the fair market value of F & G shares on a marketable minority interest basis as of year-end 1992. However, Defendants provided expert testimony at trial by Ahstrom who determined that the increase from the stock value on a minority basis at year-end 1992 to the agreed purchase price of $19.50 per share valued on a control interest basis in late 1995 was roughly proportionate to the increase in several measures of financial performance, including adjusted pretax unleveraged income. The contemporary analyses by Valuemetrics and the retrospective valuation by Defendants' valuation expert Reilly, whose firm performs approximately 400–500 ESOP appraisals annually, also supported the fairness of the $19.50 price.

108. On November 29, 1995, U.S. Trust announced that it was willing to recommend that the ESOP purchase a controlling block of F & G shares at $19.50 per share.

109. On November 29, 1995, F & G's board of directors passed a resolution authorizing the amendment and restatement of the F & G ESOP and Trust and directing that Magna Bank be removed as trustee of the ESOP and that U.S. Trust be appointed as successor trustee. The resolution authorized each of the company's officers to notify Magna Bank of its removal and of the appointment of U.S. Trust as its successor and also authorized F & G's

executive committee to proceed with the ESOP transaction at a price of $19.50 per share.

110. In a letter authored by Regal on behalf of F & G and dated December 4, 1995, F & G notified Magna Bank that it was being removed as trustee of the ESOP "subject to our providing you with satisfactory written evidence of the appointment of a successor and of the successor trustee's acceptance of the trusteeship." Magna Bank acknowledged its receipt of the removal letter on December 6, 1995.

111. Regal also authored a letter dated December 4, 1995, on behalf of F & G, informing U.S. Trust that it was being appointed as successor trustee of the ESOP and asking U.S. Trust to accept the appointment in writing. However, U.S. Trust's special fiduciary committee did not formally accept the ESOP custodial account until it met on December 19, 1995.

112. Valuemetrics issued a second transaction memorandum on December 7, 1995, that indicated that the ESOP II transaction would involve the transfer of 3,589,743 shares at $19.50 per share price. This was a greater number of shares than was anticipated in Valuemetrics' first transaction memorandum and would result in the ESOP holding a larger ownership interest in F & G. The memorandum was prepared from information furnished by F & G and advised that "[t]he Trustee should perform its own independent investigation of the Company." "The information contained in the Memorandum does not purport to present a complete picture of the business or prospects of F & G or other risks inherent in any equity investment in the Company. Neither the Company nor any of its advisors makes any representation or warranty as to the accuracy or completeness of this Memorandum."

113. The December 7, 1995 transaction memorandum further stated:

This Memorandum includes certain statements, including projections, with respect to the anticipated future performance of the Company. Such statements are based on various estimates and assumptions by the Company, which estimates and assumptions may or may not prove to be correct. Although the projections contained herein have been prepared with significant input from the Company's management in good faith, such projections involve significant elements of subjective judgment and analysis and would be materially different if different estimates and assumptions were employed. No representation is made as to the accuracy of any such statements, and there can be no assurance that the projected results will be attained.

114. Pellegrino provided the "top line" sales projections to Valuemetrics, after reviewing the projections with Regal. Foster also reviewed the projections. These three individuals collectively received about $50 million from the ESOP in the December 1995 transaction: Foster received $33,120,789.00; Regal received $13,414,284.00; and Pellegrino received $4,126,648.50. However, to say that Pellegrino received $4,126,648.50 on December 20, 1995, is somewhat misleading, as the record reflects that he reinvested a substantial portion of the proceeds in more shares of F & G stock. Pellegrino testified that after paying taxes on the sale of his shares and reinvesting in additional shares, the amount of cash left over was relatively small.

115. The December 7, 1995, transaction memorandum projected that MBC would provide almost fifty percent of F & G's income from 1995 to 2000.

### December 1995 Legal Due Diligence

116. The Sonnenschein Firm acted as counsel for U.S. Trust in the December

1995 ESOP transaction and was retained to perform legal due diligence, as well as to prepare the documentation for the transaction. In light of the uncertainty as to whether the ESOP II transaction would proceed, U.S. Trust had requested the Sonnenschein Firm "not to get into heavy levels of due diligence" until late November or early December 1995. Accordingly, as of late November or early December 1995, Sonnenschein "literally had to do all of the diligence."

117. There is no claim that Sonnenschein was not qualified to serve as U.S. Trust's legal advisor, and it is undisputed that Regal and Pellegrino understood that the Sonnenschein Firm was nationally recognized as having substantial ESOP expertise.

118. The billing partner in the Sonnenschein Firm was responsible for pulling the teams together that did the work and assuring that a total finished product was delivered. A core set of seven attorneys was assigned to review the 1995 ESOP transaction. These attorneys were divided into three teams: ERISA/IRS compliance; corporate; and lending/financial. According to the billing partner, the due diligence conducted by the corporate team was to be the type of diligence in which an investor investing in the same amount and type of stock investment would normally engage. In other words, the corporate team was to engage in the same level of due diligence that a normal buyer, be it a plan or not a plan, would have engaged in before it borrowed money and purchased stock.

119. On December 12, 1995, the Sonnenschein Firm faxed a Legal Document Review Memorandum to the Kavanagh Firm requesting certain documents to be provided for review. Among the documents requested were copies of any significant correspondence with any regulatory agencies.

120. Attorney Karen Stumpe ("Stumpe") from the Kavanagh Firm testified that she probably reviewed the files in her documents to look for responsive documents and discussed the requests with Stephen Bartley ("Bartley"), F & G's Corporate Controller in 1995 who subsequently became Vice President of Finance, to make sure that he understood what was being requested. However, she did not recall having provided documents in response to the inquiry and did not review F & G's production to the Sonnenschein Firm. She did not recall the specifics of any conversations that she may have had with anyone from the Sonnenschein Firm, nor did she recall having requested MBC to send documents to the Sonnenschein Firm or asking anyone at F & G to assemble documents from MBC to send to the Sonnenschein Firm.

121. Sonnenschein also conducted Lexis document searches to determine if there were any unreported judgments or pending lawsuits involving F & G or its subsidiaries and UCC searches to look for outstanding liens.

122. On December 13, 1995, an associate in the Sonnenschein Firm first heard of F & G and the U.S. Trust transaction when he was given a memo and advised by a partner in the firm's corporate department that he "may be asked to do some due diligence relating to the company." The associate had taken the Illinois bar examination in the summer of 1994 and had started working at the Sonnenschein Firm in September 1994 in the securities, corporate and tax department. He understood that the purpose of the legal due diligence was to establish that there were no significant legal impediments to the transaction and to provide U.S. Trust with a basis for having exercised reasonable care in its fiduciary duty in analyzing the transaction. The associate was advised

that other law firms representing B.A. Securities and the lenders for the ESOP II transaction had already conducted legal due diligence relative to the transaction, and that the Sonnenschein Firm was to provide supplementary legal due diligence to assure that there were not any surprises.

123. At about 9:30 p.m. on December 13, 1995, the associate received a call at home from a partner in the Sonnenschein Firm indicating that he would need to go to Peoria the next day to do due diligence because "the transaction was on an expedited basis."

124. After he arrived at F & G in Peoria on December 14, 1995, the associate went over "each and every item on the due diligence request list with Mr. Bartley." The associate was provided full access to F & G's records, including materials that had been provided to directors in connection with F & G's quarterly board meetings. He reviewed the board books that the directors received at these meetings "for a number of years."

125. Regal and Pellegrino were copied on the due diligence request list and testified that they instructed F & G officers and employees to cooperate fully with the due diligence efforts and to provide any requested information. They both further testified that they were never informed that F & G's production had been deficient in any way. That testimony was credible. There is no evidence in the record establishing that Foster was copied on the due diligence request list.

126. Bartley testified that in addition to providing internal documents, he requested documents from outside sources, including audit response letters from F & G's independent auditor, which were then forwarded to the Sonnenschein firm. Among those audit response letters were letters from Attorney Awerdick notifying Price Waterhouse of the North Carolina inquiry and discussing the possible impact of a change in the regulatory environment on MBC's sweepstakes promotions.

127. When asked who at F & G was responsible for responding to the portion of the Sonnenschein document request seeking copies of settlements, judgments, significant correspondence with regulatory agencies, governmental licenses/permits, and information concerning pending or threatened litigation or regulatory actions, Bartley stated that it was his understanding that such legal matters would have been handled and produced by F & G's outside counsel.

128. On December 16, 1995, the associate "tried to complete all of the due diligence inquiries that [he] had made and make sure that [he] had been provided satisfactory answers or documents responsive to the requests in the list," and then returned to Chicago. As far as the associate was aware, he was the only attorney responsible for gathering data on all matters responsive to the due diligence request. He made general inquiries into pending legal matters, but did not follow-up by asking for specific additional documents referenced in the materials that he reviewed, such as the letters of inquiry from the state attorney generals or responses from Attorney Awerdick.

129. The associate prepared handwritten notes and typed up an "incomplete set" of those notes, but did not prepare a written report on his due diligence. His typed notes included as an open issue as of December 17, 1995, "Tom Stumb re Michigan Bulb legal matters." The associate did not recall whether he spoke to Stumb in December 1995. However, Stumb testified that he did not have any discussions with any representative of the Sonnenschein Firm on or before December 20, 1995.

130. The associate had copies of Awerdick's audit response letters in his file but

does not remember anything about them. Awerdick's audit response letters for 1994 and 1995 stated that MBC would have to make "fundamental changes" to its marketing if prize and gift statutes were applied to the "everybody wins" element of MBC's promotions. It is undisputed that the associate did not speak to Awerdick in December 1995, and there is no evidence in the record that suggests that anyone else from the Sonnenschein firm spoke with Awerdick in connection with the legal due diligence process.

131. In December 1995, the associate knew that MBC "ran a sweepstakes program" and had been told by someone at F & G that MBC's sweepstakes program "was similar to Publishers Clearinghouse sweepstakes program." He knew that a large percentage of F & G's business was attributable to MBC, but did not know what MBC's three major sweepstakes promotions were, what MBC's first round prize was, or how many mailings were made by MBC.

132. On December 18, 1995, the associate met with a Sonnenschein partner and went over the due diligence request list. The associate told the partner that he had not "found anything significant in [his] due diligence review." He reported on "a piece of litigation pending with a woman by the name of Voiten who made those cats for the popcorn tins," but does not recall reporting anything about sweepstakes.

133. Before his deposition was taken in this case on May 17, 2002, the associate had never seen: (a) the letter to MBC dated October 4, 1995, from the State of Indiana Office of the Attorney General regarding MBC's possible violation of Indiana's Promotional Gifts and Contests Act; (b) the letter to MBC dated October 11, 1995, from the State of Iowa Department of Justice stating that an MBC solicitation did not comply with Iowa's Prize Notification Law; (c) the letter to MBC dated December 1, 1994, from the North Carolina Attorney General's Office regarding MBC's failure to provide a satisfactory response to letters dated August 9 and October 26, 1994, as well as a second complaint that had been filed against MBC; (d) the letter to MBC dated December 14, 1995, from the Nebraska Attorney General's Office regarding a Civil Investigative Demand upon MBC; (e) the letter to MBC dated June 16, 1993, from the Office of the Attorney General of the State of Arkansas regarding MBC's suspected violations of the Arkansas Mail and Telephone Consumer Product Promotion Fair Practices Act and Act 137 of 1993 requiring the registration of telephonic sellers; (f) the MBC Interoffice Memorandum to Patino from Ostertag dated August 9, 1993, regarding Illinois Sweeps legislation; (g) the memorandum and attachments to Awerdick dated September 18, 1995, from Stumb regarding his request to respond to a consumer letter dated September 14, 1995; (h) the facsimile to Stumb from Awerdick dated July 10, 1995, faxing a "draft" response to a customer complaint by a Michigan consumer; (i) the letter to the Michigan Attorney General dated May 4, 1995, from a consumer regarding a "fraud claim against MBC"; (j) the letter to Foster dated May 23, 1995, from a consumer advising that he had reported MBC to the Washington Attorney General's Office. These documents were arguably responsive to the Sonnenschein Firm's December 12, 1995, due diligence request. Bartley, who had spoken with Attorney Stumpe regarding this process, understood that outside counsel was responsible for and would have provided this type of legal documents.

134. Stumpe testified that she didn't provide copies of such documents because she didn't have them. She didn't know anything about the regulatory process or

inquiries outside of what she read in reviewing the board books.

135. Accordingly, it appears that some documents that were arguably requested, such as those referenced in ¶ 133, were not provided. Based on the evidence presented at trial, the Court does not believe that this was intentional, or that Foster, Regal, or Pellegrino encouraged or had any knowledge of this deficiency in the document production.

136. Again, Durchslag's credible and unrefuted expert testimony established that the inquiries and investigations of MBC by state attorneys general were a routine part of the direct mail/sweepstakes marketing business and did not present a material threat to MBC in December 1995.

137. Having said that, there is a complete absence of evidence in the record, documentary or testimonial, from the partner supervising the corporate due diligence team for the Sonnenschein Firm. There are no notes or memoranda to the file or anything else concrete in this record to support a finding that this partner did anything by way of substantial analysis of the issues involved in this case. Nor is there any indication that he was ever aware of MBC's extensive use of sweepstakes marketing or governmental regulatory inquiries but concluded that they did not present material issues. The record reflects only that this partner is no longer with the Sonnenschein Firm and could not be located to testify in this case. Therefore, he was not presented as a live witness, and his deposition was never taken.

138. The only evidence indicating that corporate legal due diligence actually occurred is what was provided by the young associate. The record is devoid of any evidence indicating the substance of any communications between the corporate due diligence team and U.S. Trust. No written report was prepared regarding this aspect of the legal due diligence, and no

notes memorializing any conversations between the associate and the partner in the Sonnenschein Firm who supervised the corporate due diligence or between the supervising partner of the corporate team and Goldberg were introduced at trial. Thus, there appears to be a substantial gap in the legal due diligence performed by the Sonnenschein Firm. Although it is possible that the corporate due diligence was fully explored and discussed, it is not possible for the Court to reach this conclusion on the record presented at trial.

139. If Goldberg had seen Awerdick's February 22, 1995, letter to Price Waterhouse L.L.P., which advised that MBC would have to make "fundamental changes" in its mailings if certain prize and gift laws were applied, and Stumb's October 19, 1995, memorandum contained in the October 1995 F & G board book, advising that MBC had received sweepstakes inquiries from three states in two weeks in October 1995, Goldberg "would have asked for a further understanding from the company." However, Goldberg testified that based on what he knew about the state of the industry, it would not have affected the outcome of the transaction.

140. Awerdick's February 22, 1995, letter and Stumb's October 19, 1995, memo were within the scope of the Sonnenschein Firm's due diligence requests and were apparently received during its due diligence visit because the documents were produced from the firm's files pursuant to a subpoena issued in this case.

141. On or before December 20, 1995, Goldberg had only a general understanding of MBC's sweepstakes promotional program and did not focus specifically on the "everybody wins" promotion. On or before December 20, 1995, Goldberg was not aware that the percentage of MBC's sales generated by sweepstakes was between 80–85%.

### Closing the ESOP II Transaction

142. On December 18, 1995, Stuber contacted Magna Bank and informed its trust officer that the closing would occur on the ESOP transaction on December 19, 1995, and that U.S. Trust would be executing the documents as successor trustee of the ESOP. Stuber faxed Magna Bank a copy of a draft Collateral Custody Agreement, which identified U.S. Trust as the trustee of the ESOP and Magna Bank solely as the collateral agent and the custodian of the purchased F & G shares.

143. Although Magna Bank had a contractual right to require thirty days written notice of its removal, Magna Bank did not voice any objection to U.S. Trust acting as trustee at the closing, ask to attend the closing of that transaction, try to prevent the closing, or request or attempt to be involved in the decision on whether the ESOP should enter into the transaction. Magna Bank executed a final version of the Collateral Custody Agreement and accepted the benefits of the 1995 transaction by receiving fees in its new roles of collateral agent and custodian. There is no evidence that Magna Bank ever asserted that it was still trustee at the time of the ESOP transaction or that its approval was necessary to the transaction or that it ever took any action to challenge the ESOP transaction on any grounds.

144. Houlihan presented its report dated December 19, 1995, to U.S. Trust. Houlihan concluded that the fair market value of F & G's equity after consideration of existing debt, future non-cash compensation, and associated tax benefits was $233 million. According to Houlihan's analyses, the midpoint value of the stock was $19.81 per share at the time of the transaction.

145. Houlihan's December 19, 1995, presentation to U.S. Trust included a one-page Strengths–Weaknesses–Opportunities–Threats ("SWOT") analysis. The SWOT analysis mentioned MBC under "strengths" (MBC offered "greater product variety than competing mass merchants") and under "Opportunities" (MBC had "recently introduced several non-horticultural tradestyles"). The threats catalogued by Houlihan did not include government regulation of sweepstakes or any risk with respect to MBC's sweepstakes.

146. Houlihan had a copy of MBC's 1996–1998 Strategic Plan dated August 1995 in its file.

147. In connection with the 1995 ESOP II transaction, Houlihan did not: (a) visit MBC's offices in Grand Rapids; (b) speak to Stumb, Fujimoto, or Awerdick; (c) review any of the specific sweepstakes mailings that MBC sent to its customers or prospective customers; (d) conduct any investigation into the market conditions of sweepstakes or research anything relating to the sweepstakes industry; (e) know what percentage of MBC's sales were generated by sweepstakes marketing or what percentage of F & G's business was sweepstakes oriented; (f) know what MBC's three main sweepstakes marketing approaches were; (g) know what MBC awarded to its customers as the first round prize; (h) know that the financial projections used in the F & G valuations were prepared by management who were also selling shareholders in the transaction; or (i) know of any correspondence, actions, inquiries, memos, or conversations with any state attorneys general related in any way to any part of the business of F & G.

148. Plaintiffs' expert Gregory Wolski, a Certified Public Accountant with Ernst & Young, suggested that the risks associated with MBC's sweepstakes marketing practices were not given proper attention in valuing the F & G stock. He testified that if appropriate diligence had been conducted, a prudent investor would have concluded that there was too much risk and

made a decision not to enter into the ESOP II transaction. However, Wolski is not an expert in the field of sweepstakes marketing and was not in a position to credibly opine on the materiality of any risk presented by sweepstakes dependency or governmental regulation in December 1995. Given Durchslag's credible and un-refuted expert testimony that the inquiries and investigations of MBC by state attorneys general did not present a material threat to MBC in December 1995, the Court finds Wolski's testimony to be un-persuasive.

149. Wolski criticized the statement in Houlihan's engagement letter that they would not independently verify the accuracy and completeness of the financial information supplied to them by F & G. Similarly, Plaintiffs' expert Thomas Bagley ("Bagley") testified that a prudent buyer would not have assumed that the information provided by selling shareholders was correct.

150. In connection with its opinion, Houlihan to some degree relied upon the financial forecasts and projections provided to it and assumed that they had been reasonably prepared and reflected management's best then-available estimates of the future financial results and conditions of F & G. Houlihan did not independently verify the accuracy and completeness of the information supplied to it with respect to F & G and expressly did not assume any responsibility with respect to the information supplied to it with respect to F & G. In expressing its opinion, Houlihan also relied on the Officer's Certificate from Dickes dated December 20, 1995.

151. However, it is not accurate to say that Houlihan did no independent analysis of F & G's financial prospects or blindly accepted the hopes and representations of F & G officers. To the contrary, the record indicates that Houlihan, along with Shea of U.S. Trust, performed exhaustive analyses of the information provided and conducted independent valuation analyses. In evaluating the transaction from a financial perspective, it is clear that they looked behind the management projections to the underlying financial history and challenged the forecasts as "too aggressive" after diligent inquiry and deliberation.

152. F & G's management did not give Sarafa any reason to believe that there were any negative issues relating to MBC's sweepstakes. As far as he knew, "sweepstakes" was not a bad word. On or before December 20, 1995, Sarafa understood "dependency on sweeps, possible threats" to mean that if MBC were going to substantially increase market share, the company would have to attract certain groups of customers that it currently was not attracting just with sweeps, and MBC needed to have a diversified promotional strategy beyond sweeps. On or before December 20, 1995, Sarafa was not aware that in 1995 MBC received approximately 26,900 written sweepstakes complaints from its customers, nor did he know that these inquiries represented only .03% of MBC's mailings for the year.

153. In doing "industry research," Houlihan looked at the direct mail and catalog industry generally. During this research, Houlihan did not find anything related to the regulation of sweepstakes. Sarafa's understanding in December 1995 was that in the industry at the time, there were no issues being raised with regard to sweepstakes.

154. U.S. Trust's Special Fiduciary Committee, comprised of six voting members, had to approve each engagement involving employer stock in an employee benefit plan. Upon completion of the due diligence and prior to the closing of a transaction, the Special Fiduciary Committee would meet to review the work of U.S. Trust and its financial and legal advisors;

the Special Fiduciary Committee's approval was required in order to proceed with, or to effect the closing of, any transaction.

155. On December 19, 1995, U.S. Trust's Special Fiduciary Committee met, and the ESOP transaction was approved. There were no discussions about pending regulatory investigations into MBC's sweepstakes. Goldberg testified that U.S. Trust was not aware of pending investigations at that time.

156. When asked what steps he took to make sure that the threats to F & G's business listed in Houlihan's SWOT analysis were accurate, Goldberg responded in part that he and Shea would have reviewed the page with the SWOT analysis and that, "based on what we knew and what had been explained to us, that this reasonably captured the threats associated with the company as we understood it."

157. Shea does not specifically recall any discussions with anybody from F & G regarding governmental regulation or dependency on sweepstakes as possible threats. According to Shea, there was "a general discussion of risks, opportunities, weaknesses and threats of the company that ensued during our due diligence period," and Houlihan's SWOT analysis "reflects the strengths, weaknesses, opportunities and threats of Michigan Bulb as they were described to us on or before December 20, 1995."

158. During the December 19, 1995, meeting of the Special Fiduciary Committee, Houlihan made a presentation to U.S. Trust's Special Fiduciary Committee but did not discuss anything regarding MBC's sweepstakes marketing.

159. The closing for the 1995 ESOP transaction was held on December 19 and 20, 1995, in Chicago, Illinois. At closing, opinion letters were provided from Sonnenschein and Houlihan.

160. Houlihan's opinion letter advised that it had reviewed the 1995 ESOP transaction and had determined that:

[T]he consideration to be paid by the ESOP for the Company's securities in the Transaction is not greater than adequate consideration for such securities; the Transaction is fair and reasonable to the ESOP from a financial point of view, the loan between the ESOP and the Company, taken as a whole, is fair and reasonable to the ESOP from a financial point of view; and the interest rate, with respect to such loan, is fair and reasonable to the ESOP from a financial point of view.

161. Houlihan's report also reflected its consideration of the impact of the corporate debt associated with 1995 ESOP transaction on F & G's share value and ability to repay the debt. Specifically, the report contained "Covenant Testing" analyses reflecting F & G's ability to meet its loan obligations under the assumption that F & G met its management's financial projections and under another assumption that it fell somewhat short of those projections.

162. Sonnenschein's opinion letter stated that its "representation of the Trustee with respect to the matters addressed by this opinion has been limited to matters involving the compliance with the Employee Retirement Income Security Act of 1974, as amended ('ERISA') and the Internal Revenue Code of 1986, as amended (the 'Code')." The opinion further stated:

We have not, for purposes of this letter, been retained to perform, nor have we performed, any independent review or investigation of any statutes, ordinances, laws, rules, regulations, agreements, instruments, contracts, orders, writs, judgments, rules or decrees to which the Company, the Plan or the Trust may be a party or to which the Company, the

Plan or the Trust or any property of any of them may be subject, or by which the Company, the Plan or the Trust or any property of any of them may be bound, except ERISA, the Code and regulations and rulings issued thereunder; nor for purposes of this letter, have we been retained or engaged to perform, or performed, any independent review or investigation as to the existence of any actions, suits, proceedings, orders, investigations or claims before or by any court, arbitrator, or governmental department, commission, board, bureau, agency or instrumentality pending or threatened against or relating to the Company, the Plan or the Trust or any property of any of them.

163. The Sonnenschein Firm advised U.S. Trust that in acting as the ESOP trustee, it was subject to certain standards of procedural due diligence involving factual examination and obtaining expert legal and financial advice. The opinion also stated that the Sonnenschein Firm's opinions were premised upon the assumption that such due diligence had occurred and that U.S. Trust had arrived at its findings by way of a prudent and thorough investigation of circumstances currently prevailing, the application of sound business principles of valuation, and in reliance on the Financial Advisor's Opinion, the advice of the Financial Advisor, and the advice of its legal counsel.

164. The Sonnenschein Firm's opinion letter discussed U.S. Trust's duties of prudence and diligence at length and advised that, in general, whether a fiduciary has satisfied the requirements of Section 404(a)(1) of ERISA is a factual question which must be determined based upon expert financial and business judgments.

165. In discussing the duties of prudence and diligence imposed on U.S. Trust, the Sonnenschein Firm also stated:

Regulations under Section 404(a)(1)(B) of ERISA provide that with regard to an investment or investment course of action taken by a fiduciary of a plan pursuant to his investment duties, the requirements of Section 404(a)(1)(B) of ERISA are satisfied if the fiduciary (A) has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (B) has acted accordingly. 29 C.F.R. § 2550.404(a)–1(b).

A fiduciary must discharge his duties with the care, skill, prudence and diligence under the circumstances then prevailing of "the traditional 'prudent man'." *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.1982). Prudence is thus measured according to the objective prudent person" standard developed in the common law of trusts. *Donovan v. Mazzola,* 716 F.2d 1226, 1231 (9th Cir. 1983). Subjective good-faith simply does not come into play. *Leigh v. Engle,* 727 F.2d 113, 124 (7th Cir.1984). The focus of the inquiry under the prudent man rule is on the fiduciaries' independent investigation of the merits of a particular investment rather than an evaluation of the merits alone. *Donovan v. Cunningham,* 716 F.2d 1455, 1467. The test of prudence focuses on whether the fiduciaries, at the time they engage in a transaction, have employed the appropriate methods to investigate the merits of the investment and to structure the investment. *Mazzola,* 716 F.2d at 1232.

166. The Sonnenschein Firm gave U.S. Trust a range of advice regarding whether it would be appropriate for U.S. Trust to rely on a financial advisor that would rely upon F & G's financial projections. U.S. Trust was advised to evaluate the financial advisor's opinion and be satisfied that it was reasonable to rely on the opinion, because ultimately U.S. Trust as trustee was making the decisions of whether to close the transaction, whether the transaction was prudent, and whether the various other components were satisfied.

167. The Sonnenschein Firm did not provide any opinion to U.S. Trust as to whether U.S. Trust had in fact adequately investigated the financial forecasts and projections that were provided by F & G. The billing partner in the firm was aware that the financial forecasts and projections had been prepared by some of the selling shareholders, and advised U.S. Trust to undertake a more skeptical and questioning review.

168. Dickes, in his capacity as Executive Vice President of F & G, executed an Officer's Certificate certifying that the financial statements and other business and financial information were true and complete when given and remained true, that the projections of the future financial condition of F & G were based on assumptions that remained true, and that there had been no adverse developments for F & G since the information and projections were provided.

169. On December 20, 1995, F & G's executive committee, comprised of Foster, Regal and Pellegrino, unanimously passed a resolution authorizing the Vice Chairman or any Vice President of F & G to execute and deliver certain documents, including the Note Agreement between F & G and the lenders, $19,999,998.50 Series A Senior ESOP Notes, $50,000,000 Series B Senior ESOP Notes, the F & G Employee Stock Ownership Trust as amended and restated effective December 20, 1995, and the F & G Employee Stock Ownership Plan as amended and restated effective January 1, 1995. The resolution also authorized the officers of F & G to take "all other such actions that are necessary and proper to effectuate the above resolution...." Pursuant to this authority, Regal, acting on behalf of F & G, appointed U.S. Trust as trustee of the ESOP and signed the amended and restated Employee Stock Ownership Trust that same day.

170. U.S. Trust accepted the appointment as successor trustee of the ESOP on December 20, 1995, and Magna Bank was notified of U.S. Trust's acceptance.

171. Also on December 20, 1995, U.S. Trust executed the various closing documents on behalf of the ESOP and made written findings in connection with the ESOP II transaction. In the written findings, U.S. Trust expressly noted its reliance on the opinions it received from Houlihan, the Sonnenschein Firm as counsel to the trustee, the Kavanagh firm as general corporate counsel to F & G, the firm of Mayer, Brown & Platt as special ERISA counsel to F & G, and Price Waterhouse, as well as Valuemetrics' transaction memorandum, the representations and warranties of F & G and its controlling shareholders, and the pertinent finance documents. U.S. Trust stated that the terms and conditions of the transaction were prudent and reasonably designed to further the purposes of the ESOP, satisfied the requirements of Section 408(e) of ERISA and Section 4875(d)(13) of the Internal Revenue Code, and also that the purchase price of the shares did not exceed the fair market value of the shares.

172. Goldberg signed these findings on behalf of U.S. Trust.

173. As part of the ESOP II transaction, U.S. Trust entered into a Stock Purchase Agreement with Foster, Regal, Pel-

legrino, and other F & G officers and directors. Paragraph 5.7 of the Stock Purchase Agreement stated in relevant part:

Neither the Company nor any Subsidiary is engaged in or a party to any legal action, suit, investigation, arbitration or other proceeding pending or, to the best knowledge of each Controlling Shareholder and the Company, threatened, against or affecting the Company or any Subsidiary or any of their respective properties at law or in equity or before or by any governmental department, commission, board, bureau, agency or instrumentality, and neither the Company nor any Subsidiary has been charged with or, to the best knowledge of each Controlling Shareholder and the Company, is under investigation with respect to any violation of any provision of federal, state or other applicable law or administrative regulation which is likely to materially and adversely affect the properties, business, prospects, profits or condition (financial or otherwise) of the Company and its Subsidiaries, nor is there any basis for any of the foregoing. The Company and the Subsidiaries are in compliance with all applicable laws, except those of which a violation would not and, so far as each Controlling Shareholder can now foresee, will not, individually or in the aggregate, materially adversely affect the properties, business, prospects, profit or condition (financial or otherwise) of the Company and its Subsidiaries.

174. In entering into the Stock Purchase Agreement, U.S. Trust caused the ESOP to use the proceeds of a $70 million loan to purchase 3,589,743 F & G shares from F & G shareholders. Each of the selling shareholders signed a written receipt for the purchase price.

175. In order to make the loan to the ESOP, F & G entered into a Note Agreement with the four institutional lenders: Harris Trust & Savings Bank ("Harris Bank"), the Northwestern Mutual Life Insurance Company, LaSalle Bank, and the Northern Trust Company. Under the terms of the Note Agreement, the institutional lenders agreed to lend F & G just under $70 million dollars on an unsecured basis.

176. F & G loaned the full $70 million to the ESOP conditioned upon the ESOP using the money to purchase shares of F & G, and therefore, the ESOP could not have used any part of the $70 million to buy stock in some other company or to purchase some other investment.

177. The appropriate debt level was determined before U.S. Trust agreed to a share price, so the amount of leverage did not change when U.S. Trust negotiated the share price from $24.00 to $19.50 per share. Instead, the ESOP simply purchased a larger number of shares with the $70 million than had originally been anticipated. Had the share price been higher than $24.00 per share, the ESOP would simply have purchased a smaller number of shares for the $70 million.

178. The ESOP, through U.S. Trust, used the $70 million loan to purchase 3,589,743 shares of F & G common stock at $19.50 per share. A significant portion of these shares were purchased from F & G's founders, Foster and Regal. In addition, a number of F & G's officers and directors were allowed to exercise stock option rights and sell to the ESOP shares granted to them under F & G's Executive Incentive Plan ("EIP"). Most of the net proceeds from the sale of those shares, after the payment of taxes and the applicable option price, were reinvested by F & G management in newly issued shares of F & G stock at a price of $19.50 per share.

179. Plaintiffs' expert Hitchner testified that the true value of the F & G stock

as of December 20, 1995, was actually $10.85 per share. Hitchner did not perform his own independent evaluation. He arrived at his conclusions after making certain modifications to the valuation performed by Defendants' expert Reilly to reflect what he believed to be a more appropriate magnitude of risk based on his conclusion that Reilly's adjustment for sweepstakes risk was inadequate, and neither Valuemetrics nor Houlihan had considered this factor in their analyses.

180. Specifically, Hitchner considered the 6% reduction that Reilly used to reflect sweepstakes risk to be insufficient and instead implemented a 10% reduction to reflect the specific company risk attributable to sweepstakes marketing. He thought that a higher Beta (a measurement of a company's debt/equity mix) than that used by Reilly should have been used and that Reilly should have used the Gordon Growth Model to determine the terminal value in his analysis. However, Hitchner conceded that the percentage of company specific risk selected by any given valuation professional was completely subjective and that there were different sources for deriving predicted Betas, so that valuation professionals could obtain different Betas for the same company as a result of having consulted different sources. Additionally, Reilly testified that his use of market-derived exit multiples to determine the terminal value for purposes of the valuation analysis was an acceptable alternative to the Gordon Growth Model and cited Hitchner's own book on business valuation as support for this assertion.

181. Reilly cited authority for the proposition that any single risk factor generally warrants a premium in the 0–5% range, and the precise percentage used is a subjective exercise of the valuator's judgment. Because he had determined that all of the other layers of risk in his analysis were in the 4–6% range, and he wanted to add another layer of risk to reflect the level of sweepstakes risk that he had been directed to assume, he selected a 6% company specific risk premium and obtained a fair market value of $24.00 per share. However, Reilly testified that even assuming that Hitchner's selection of a 10% risk premium was more appropriate, the value of F & G's stock would still have been $22.15 per share, which is still more than what the ESOP actually paid for it on December 20, 1995.

182. Hitchner also criticized the use of a 20% control premium as an inappropriate value enhancement except in a case where a strategic buyer was making the purchase that was believed to guarantee at least a 20% increase in cash flow/future profits. In contrast, Reilly and Houlihan's Sarafa both testified that the use of a control premium was appropriate to reflect the fact that by consummating the ESOP II transaction, the ESOP was effectively purchasing a controlling block of stock and would change from a minority position to being the majority shareholder of F & G as a result. Reilly and Sarafa stated that the key consideration in performing the valuation was to determine what the buyer would be obtaining through the purchase, which in this case meant determining what an informed buyer would be willing to pay to obtain a controlling interest in F & G. Because the ESOP would then have the power to determine the management of the company or assert other control prerogatives and could ultimately resell its stock to another buyer down the road as a majority position, the use of a control premium was justified; Reilly and Sarafa both indicated that it is the potentialities rather than what the ESOP actually intended to do with its ownership interest that is relevant. Reilly also testified to the existence of, and reliance by valuation professionals on, proposed regulations under ERISA allowing a control premium in this type of

situation. After considering the balance of the expert testimony, the Court finds the explanation given by Reilly and Sarafa to be more persuasive.

183. Plaintiffs did not produce an independent valuation of the F & G stock. The Court finds Reilly's testimony to be more credible than Hitchner's testimony because Hitchner primarily substituted different numbers into Reilly's analysis without providing any satisfying explanation of why the substitutions were economically valid. Reilly gave lengthy testimony with respect to the interrelationships between the various numbers in the discounted cash flow valuation analysis and indicated that the interplay between the numbers, with the exception of the independent company specific risk premium, would not permit the type of selective changes made by Hitchner. The Court found this testimony to be persuasive, particularly in the absence of any contrary explanation from Hitchner. Additionally, Hitchner conceded that if an acknowledged expert in the sweepstakes regulatory industry opined that the sweepstakes issues faced by MBC were not a material risk to the future of F & G, he would reconsider his opinion as to the propriety of the 10% company specific risk premium. Durchslag's testimony to precisely that effect, in combination with the fact that Hitchner's other criticisms are largely subjective exercises of judgment, provide a further basis for discounting his valuation opinion.

184. Even if Reilly's determination of fair market value was upwardly biased, the Court finds that any necessary corrections supported by the record in this case would not have resulted in a fair market value of less than what was paid on December 20, 1995.

185. Based on the record at trial, the Court finds that $19.50 per share was reasonable and adequate consideration for the F & G stock. Thus, the ESOP did not pay more than adequate consideration or the fair market value of the stock purchased in the ESOP II transaction.

### Post–Closing Occurrences

186. Effective March 1, 1996, Foster stepped down as F & G's CEO and Chairman. He then passed away on July 11, 1996.

187. For two years after the December 20, 1995, stock purchase transaction, F & G continued to enjoy record profits.

188. Following the ESOP II transaction, consumers and state attorney general offices continued to inquire into MBC's compliance with the law. Legal reports to F & G's board of directors routinely reported on the increasing enforcement and change of sweepstakes laws. Goldberg commonly received legal reports to F & G's board of directors, and attended some F & G board meetings during which pending legal matters were discussed.

189. On April 12, 1996, an Investigator with the Consumer Protection Division of the Michigan Attorney General wrote to Ostertag and advised that the office had received many complaints about MBC since early 1995.

190. Since he was retained in 1991, Awerdick had advised MBC that the laws of at least nine states could be read to bar the "everybody wins" approach. However, he also advised that the laws were ambiguous and seldom enforced. Awerdick indicated that if states were to enforce certain laws, MBC would have to change its mailings. However, prior to December 20, 1995, he had never advised MBC that any of its practices were illegal or that it needed to discontinue any of its sweepstakes marketing practices. It wasn't until June 1996 that Awerdick even recommended that MBC stop using the term "special prize," call it an "award," avoid saying

"win," and disclose the value of the "award."

191. In June 1996, MBC personnel met with two representatives of the Michigan Attorney General's office to discuss the increasing number of complaints that the Michigan Attorney General was receiving regarding MBC's sweepstakes. MBC's Stumb, who was at that meeting, recognized that at least one of the "first round winner" solicitations used by MBC in a Flower of the Month mailing was "misleading and cannot be defended."

192. In July 1996, the State of Connecticut filed a lawsuit against MBC, among 14 other sweepstakes companies, as part of a joint state-federal program called "Project Jackpot." The complaint against MBC alleged in part that MBC's "everybody wins" promotions had violated Connecticut law by representing that a recipient was a "winner" or had been "selected" to receive a prize or opportunity, when in fact MBC's solicitations were simply a promotional scheme designed to make contact with prospective customers for the sale of its merchandise and all or a substantial number of those receiving MBC's solicitations were notified that they were "winners." The suit was filed without notice or any contact from the Connecticut Attorney General, so MBC had no opportunity to address or resolve the allegations prior to the litigation being commenced.

193. In August 1996, Awerdick advised MBC that because the Federal Trade Commission ("FTC") had made "everybody wins" promotions a priority, there would probably be increased scrutiny of MBC's promotions. He also questioned whether MBC's overall promotional approach could be seen as "too aggressive."

194. In August 1996, Goldberg, Shea and another representative of U.S. Trust traveled to Grand Rapids, Michigan for a special presentation by Ostertag, who had replaced Foster as Chief Executive Officer of F & G, and various officers of MBC. Either during that meeting or shortly thereafter, U.S. Trust was informed of the Connecticut action, and the action was also discussed at F & G's February 1997 board meeting, which Goldberg attended. During the board's discussion, Ostertag explained his belief that the lawsuit did not have a material basis, and F & G's management expressed its confidence, based on MBC's past ability to deal with state agencies in an effective and professional manner, that the action could be handled in the normal course of business and did not represent a fundamental threat to MBC.

195. On September 18, 1996, Awerdick wrote to the Connecticut Attorney General, stating in part: "The fact that Michigan Bulb offers real products distinguishes it from the scam artists at whom the Federal Trade Commission and your office aimed Project Jackpot."

196. MBC ultimately settled with the State of Connecticut in August 1998. MBC agreed to pay the State of Connecticut $20,000 in costs and was enjoined from: (a) "representing, either directly or impliedly," that any Connecticut consumer was a "winner" or had been "selected" for receipt of a prize opportunity, when in fact, the enterprise is simply a promotional scheme designed to make contact with prospective customers, or all or a substantial number of those "entering" receive the same "prize" or "opportunity," and (b) representing that any consumer has won a prize when in fact that consumer has merely become eligible to win a prize. MBC was further enjoined from violating certain requirements regarding disclosure of odds and retail value of prizes. Testimony at trial indicated that this settlement was a business decision that had very little impact on MBC's financial position.

197. In December 1996, Awerdick sent a list of twenty-one "prize and gift states" to MBC that had been circulated at a conference that he had attended. MBC's sales to those twenty-one states regulating "everybody wins" promotions from January 1, 1996, through December 22, 1996, totaled over $50 million. In comparison, MBC's total revenues for 1996 were projected to be about $115 million.

198. In February 1997, the Vermont Attorney General's Office notified MBC that it was opening an investigation into MBC's sweepstakes promotions after having received a consumer complaint that Flower of the Month advertising was deceptive and misleading. As with the Connecticut lawsuit, MBC ultimately resolved the matter in July 1998 by entering into an Assurance of Discontinuance with the State of Vermont under which it agreed to restrict its promotions to Vermont consumers, and also agreed to pay $50,500 to the State of Vermont for attorney's fees and investigative costs, including $1,000 to be paid to the consumer that had filed the initial complaint that led to the investigation. Again, the trial testimony indicated that the Vermont settlement had very little financial impact on the company.

199. As Vermont and Connecticut accounted for a very small percentage of MBC's sales, MBC decided that it was more cost effective to discontinue any mailings into those states rather than to prepare special promotions for Vermont and Connecticut residents.

200. Defense expert Durchslag testified that it is not unusual for companies to enter into settlements or voluntary assurance agreements for business reasons or to stop marketing to states that present specific regulatory concerns.

201. The agreements to purchase stock through which the EIP participants reinvested the proceeds of their sale of stock in the 1995 ESOP transaction contained an annual put provision which allowed the EIP participants to sell back all or a portion of their EIP shares to F & G. In 1997, F & G's Board of Directors offered the ESOP the opportunity to purchase the vested shares available for sale under the EIP agreements at $18.62 per share, the value determined in the ESOP's valuation for year-end 1996. Although F & G made record profits again in 1996, the per share value was actually lower as a result of factoring in the additional debt assumed by F & G as a result of the 1995 ESOP II transaction.

202. Although the F & G board authorized the purchase of up to $1,000,000 in F & G shares, the transaction was undersubscribed and only 28,920 shares were tendered by F & G management (amounting to only $538,490.40 of the $1,000,000 authorized). Several members of F & G management, including Ostertag, declined to sell because they believed that the value of the stock would continue to increase. On June 30, 1997, the ESOP purchased the available shares at the price of $18.62 per share. In order to fund the transaction, F & G made a voluntary contribution to the ESOP of $538,490, above and beyond F & G's normal contribution.

203. During 1997, the possibility of the ESOP purchasing those F & G shares still owned by Regal and Foster's Estate also arose. At least one bank involved in the ESOP II transaction, Harris Bank, indicated its willingness to make an additional loan approximating $100 million to F & G to finance this further purchase of F & G stock. However, this further purchase by the ESOP did not come to fruition for several reasons, including the insistence of Regal and Foster's estate upon a purchase price in excess of $25.00 per share because they though the stock was worth more than the value reflected in the 1996 year-end valuation.

204. During 1997, F & G also converted to a Subchapter S corporation, which would have allowed the company to avoid paying taxes on a substantial portion of any profits. As Subchapter S corporations are unable to take a deduction for business losses, the conversion would only have made sense if F & G's officers and management expected the company to continue to achieve significant profits.

205. In October 1997, MBC entered into an Assurance of Discontinuance with the Michigan Attorney General regarding MBC's sweepstakes practices. Under the Assurance of Discontinuance, MBC agreed:

> That it would not engage in violations of Section 6 of the Michigan Consumer Protection Act, by agreeing not to distribute after December 31, 1997, any solicitation from Michigan for sweepstakes in which some recipients have been preselected as winners while other have not been preselected, unless: (a) the solicitation included a disclosure of the number of preselected winners and the fact that an individual must respond to such solicitation in order to determine whether or not the individual is a winner; or, (b) the solicitation included in the Official Rules a disclosure which would enable the individual to determine from the contents of the mailing whether or not the individual is a preselected winner. The individual will be referred to those rules in the portion of the mailing which most completely describes the sweepstakes.

The Assurance of Discontinuance did not require MBC to admit to any violation of Michigan law and expired at the end of three years. MBC was aware of the requirements that were to be included in the agreement and had already tested sweepstakes promotions containing conforming language. Based on these tests, MBC had estimated the impact on customer response rates and had incorporated an expected impact into its plans and projections for 1998.

206. By October 1997, MBC agreed with Awerdick that "non-everybody wins" versions of its promotions would be sent to at least eleven states that had particularly strict laws regarding that type of promotion. MBC had sales of almost $23 million to those eleven states in 1996. MBC also tested alternative formats for these states and incorporated the results of those tests into its 1998 plans and projections.

207. Based on its test results and taking into account both changes made to conform with the Michigan assurance and the separate promotions for the "non-everybody wins" states, MBC budgeted a 6.5% decrease in sales for the 1998 Spring season and no impact for the 1998 Fall season.

208. Although he routinely received copies of the quarterly board books and attended some F & G board meetings, Goldberg was not specifically aware that MBC made this particular change to its marketing practices in 1997.

209. MBC, having experienced record-breaking sales and profits in 1997, for the fifth consecutive year, was in the process of introducing non-sweepstakes promotions. Reflecting MBC's and, more generally F & G's growing success, Valuemetrics concluded in its annual ESOP valuation that as of December 31, 1997, the fair market value of F & G stock on a control interest basis had risen to $20.33 per share.

210. The undersubscription of the 1997 stock purchase transaction, conversion of the company to a Subchapter S corporation, and immediate refusal of the Foster Estate and Regal to sell their remaining shares at $25.00 per share suggest that state regulation and sweepstakes issues

were still not considered to be material threats even two years after the ESOP II transaction.

211. In the early weeks of 1998, MBC was performing as budgeted using the new sweepstakes formats and remained confident in the adjustments it had made.

212. On January 8, 1998, the Indiana Attorney General's office sent a Civil Investigative Demand regarding an investigation being conducted by that office.

213. In February 1998, a number of news stories appeared concerning particular sweepstakes practices used by American Family Publishers and Publishers Clearinghouse. The focus of these initial stories was on an elderly gentleman who traveled to Tampa, Florida, to claim American Family Publishers' grand prize, which was in the range of $10 million. Employees of American Family Publishers apparently treated him rudely and sent him away. The gentleman subsequently returned to American Family Publishers, this time bringing along members of the media. When he was again rudely turned away, the story of the incident was widely reported in newspapers and other media.

214. According to Defendants' expert Durchslag, the dramatic change in the regulatory enforcement climate that followed this public outcry was unexpected by sweepstakes professionals.

215. Although MBC did not use many of the sweepstakes practices at issue in the news stories, the effect of the negative publicity on consumers' reactions to sweepstakes in general caused an immediate and dramatic drop in MBC's consumer response rates.

216. As is common in the marketing field, MBC generally made its marketing commitments well in advance of the time that they would actually be issued. As a result, substantial amounts of money had been expended in the fall of 1997 for promotions that would not be sent out until the spring season of 1998. The effect of the lower response rates was compounded by the fact that MBC had not foreseen this unprecedented level of negative publicity and had already financially committed itself to future promotions based on higher expected response rates.

217. A number of former MBC and F & G officials uniformly testified that they believed the principal cause of MBC's economic reversal was the wave of adverse publicity that began in February 1998 as a result of actions by American Family Publishing and Publisher's Clearinghouse.

218. Moreover, Regal, Pellegrino and Ostertag gave this same explanation in writing as early as April 1998, long before even the possibility of a lawsuit had arisen. In April 1998, they wrote a letter to co-workers that was generally disseminated to F & G employees and stated:

> The primary cause for the first quarter loss was an overall decline in response rates for the Michigan Bulb ("MBC") spring mailings. Response rates produced lower revenue, even though we spent more on advertising and promotional activities. Management believes the decline in the MBC business is directly attributable to the negative media coverage in broadcast and newspapers relating to sweepstakes promotions by American Family Publishing, featuring Ed McMahon and Dick Clark. Unfortunately, the Media and consumers alike do not differentiate among sweepstakes promotions.

219. Following the incident with American Family Publishers in February 1998, the negative publicity surrounding sweepstakes and its impact on F & G's finances became a regular subject of discussion at F & G board meetings, which Goldberg attended.

220. In May 1998, F & G's counsel reported to F & G's board of directors that: "Michigan Bulb for many years has used sweepstakes as a business development tool. From time to time these activities attract the attention of consumer protection regulators in various jurisdictions." F & G's counsel reported on investigations of other sweepstakes marketers by various states and advised that taken as a whole, these activities and the publicity surrounding them had led to a change in the sweepstakes environment in which MBC competed. According to F & G's counsel, state authorities were taking the position that sweepstakes must not only include disclosures that assure their legality, but sweepstakes' sponsors must make those disclosures in a manner that would be understandable to unsophisticated consumers. According to F & G's counsel, "In some cases, Attorneys General are enforcing picayune provisions of their state's laws which in the past were not generally applied to national marketers. Additionally, legislatures in a number of states are considering stricter sweepstakes laws." The May 1998 report from counsel went on to discuss active investigations into MBC's sweepstakes practices by six states and Canada.

221. By June 1998, MBC was proceeding to modify its business with the goal to be compliant in all states and with the American Family Publishers' Assurance. In addition to the change not to send " 'everybody wins' in states that prohibit it" and the color-coded language change pursuant to the agreement with the Michigan Attorney General, MBC made additional modifications to:

a. Eliminate "Finalist," "Final Round," and "First Round Prize,"

b. Stop using deadline dates unless those dates were enforced,

c. Eliminate double meanings, and

d. Improve understandability.

At that time, MBC recognized the risk of making changes to its mailings without testing, and that the impact on the short-term response rate because of these changes was unknown.

222. In June 1998, MBC's sweepstakes strategy included a business formula adjustment of creating excitement with other promotional formulas besides "hard core sweepstakes." MBC's 1998 sweepstakes strategy included the creation of a new sweeps business based on the "Three C's," meaning clean, compliant, and customer friendly.

223. Also in 1998, MBC proceeded to make sweepstakes changes described in a four-page outline prepared by MBC's attorneys describing "general devices used by Michigan Bulb which could be construed as deceptive," ranging from "[o]veremphasis on the value of the special prize," "[u]se of checks, bonds vouchers and other entry vehicles which appear inherently valuable," using "[l]osing codes that imply the recipient is a winner," "[u]sing an Order Form as a Sweepstakes Activation Device," using "[m]isleading or inaccurate names for Components and Departments," using "fabricated prize files and internal memos," "[c]laiming the recipient is a winner, with qualifying language in fine print or on the next page or footnoted at the bottom of the page," implying "that [a] prize is waiting to be delivered when in reality its winner has not even been selected," and using "False/Unenforced deadlines." These and similar devices had been used by MBC before December 20, 1995.

224. The negative publicity spawned class actions and multi-state enforcement actions against other direct mail marketers and legislative hearings which in turn fed further negative publicity and decreased customer interest in direct mail sweepstakes as a whole, adversely affecting com-

panies employing direct mail sweepstakes regardless of whether those companies engaged in the actual sweepstakes practices being criticized.

225. In the summer of 1998, a putative class action was filed against MBC and five other companies challenging the companies' sweepstakes promotions. The plaintiffs in that action ultimately offered to settle their claims against MBC in return for a payment of $90,000. The case had not been resolved when F & G declared bankruptcy.

226. In August 1998, the Indiana Attorney General's office advised that it would be investigating MBC as part of a multi-state investigation on behalf of a number of states and requested that MBC produce certain types of documents. The office indicated no connection whatsoever between the 1998 multi-state investigation and its earlier inquiry into MBC's practices in 1995. After requesting documents from MBC, there is no indication in this record that the Indiana Attorney General's office continued to pursue the multi-state investigation against MBC.

227. In its October 1998 report on legal matters to F & G's board of directors, F & G's counsel reported: "The seriousness of the anti-sweepstakes sentiment faced by Michigan Bulb and other direct marketing companies that use sweepstakes as a primary marketing tool probably cannot be overstated."

228. Valuemetrics prepared a report dated December 31, 1998, opining as to the value of F & G common stock on that date. The 1998 Valuation was transmitted to U.S. Trust on or about July 8, 1999. The 1998 Valuation concluded that as of December 31, 1998, the value of F & G common stock was $8.52 per share on a control interest basis. The 1998 Valuation stated, "[F & G]'s sales have flattened in 1998 as a result of declines related to their sweepstakes business. The sweepstakes

industry severely dropped off in 1998 as a result of the negative press addressing abuses in the industry." The 1998 Valuation also stated, "[w]ith changes in the sweepstakes industry occurring as a result of the negative press it has received and the congressional investigations, [F & G]'s ability to generate profitable new sales has been dramatically curtailed."

229. The first time Goldberg learned that the share value of F & G had dropped from roughly $20.00 to $8.52 was shortly before July 8, 1999.

230. Beginning with this decline in 1998, MBC's revenue bases suffered extensive damage. Over the next three years, MBC's gross revenue declined from $197 million in 1998, to $116 million in 1999, to $65 million in 2000. During the same time period, F & G also experienced a decline in gross revenues from $471 million, to $368 million, to $337 million.

231. In the midst of this downturn, Regal and the Foster Estate made a personal loan of $10 million to F & G in 1999 to help the company recover. That loan was never repaid.

232. In response to F & G's financial troubles, U.S. Trust assumed a more active role in attempting to salvage the company. For example, rather than agree to a suggestion during F & G's February 1999 board meeting that the company file bankruptcy, Goldberg led an effort to explore the possible sale of F & G to strategic investors. To that end, Goldberg and F & G management met with representatives of several investment banks, who advised management not to sell F & G but instead to address F & G's problems and attempt to negotiate better terms with the ESOP lenders.

233. The dramatic decline in MBC's response rates ultimately led to MBC's and F & G's financial decline. In September

1999, the ESOP Administrative Committee reported that on December 31, 1998, the value of the ESOP's F & G shares was $8.52 per share, as compared to the reported value of $20.33 per share on December 31, 1997. The total value of F & G shares owned by the ESOP decreased by more than $83 million in 1998, and the reported net value of ESOP assets, after deducting liabilities, decreased more than 90% from a net value of more than $82 million on December 31, 1997, to a net value of just over $7 million on December 31, 1998.

234. On January 30, 2001, before the filing of the present suit, Plaintiffs' attorneys wrote to U.S. Trust and members of the ESOP administrative committee and requested certain documentation information regarding the ESOP. Counsel for the committee responded by providing certain documents pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), and indicating that the committee would not provide documents or information not required to be disclosed under that provision. Shortly thereafter, The Sonnenschein Firm responded on behalf of U.S. Trust, explaining that U.S. Trust considered the letter by the committee's counsel to be fully responsive. Plaintiffs initially asserted that U.S. Trust's refusal to provide them with the specifically requested information amounted to an independent breach of fiduciary duty. However, such claim was not addressed during closing arguments and is not reflected in Plaintiffs' Summary of Claims; accordingly, the Court considers this claim to have been withdrawn by Plaintiffs.

235. On February 28, 2001, Ostertag advised all F & G employees that F & G would be ceasing all sweepstakes marketing activities conducted by MBC. According to Ostertag, beginning in 1998, the nation had been bombarded with negative publicity focused on sweepstakes marketing, and:

> The continuous legislative and regulatory attention and pressures, along with the almost constant negative publicity, has served for all practical purposes, to kill sweepstakes marketing as a method of customer contact and development for those involved in direct marketing. Certainly, it has had a tremendous impact on the business fortunes of Foster & Gallagher.... This negative sweepstakes environment has subjected the entire corporation to an unsure future including layoffs, loss of jobs, and a significant reduction in our ESOP share value.

236. According to Ostertag, senior management, F & G's board of directors, and the ESOP trustee all agreed that pulling MBC out of sweepstakes was the most prudent action to take at that time.

237. In an F & G Spring 2001 newsletter, Ostertag stated that "F & G's debt and ESOP capital structure restrict reinvestment in our core businesses, let alone investment to develop new business revenue streams."

238. On July 2, 2001, F & G and its subsidiaries filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.

239. In early August 2001, U.S. Trust entered into a Joint Defense Agreement with certain other defendants to defend the claims brought by plaintiffs in this case.

240. Upon the advice of the Sonnenschein Firm, U.S. Trust entered into Tolling Agreements with many of its co-defendants in this case in late 2001 in order to preserve any claims that might exist against them for statute of limitations purposes.

241. On July 29, 2002, by order of the United States Bankruptcy Court for the District of Delaware, in connection with the liquidation of F & G and its subsidiaries, the ESOP was terminated, and U.S. Trust thereafter ceased to be trustee to the ESOP. According to U.S. Trust, the shares of F & G have been cancelled and are now worthless.

242. On or about October 3, 2002, current and former participants were mailed notices informing them of the termination. The notices explained that any claims, rights or causes of actions that may be asserted by or on behalf of the ESOP were being distributed to the former and current participants and expressly stated that Plaintiffs in this action had suggested that the ESOP may have claims against parties to the 1995 transaction.

243. Between December 20, 1995, and July 2, 2001, when F & G filed for bankruptcy, F & G was making its quarterly payments of principal and interest that became due to the ESOP lenders to pay off the loan from the 1995 transaction.

244. After December 20, 1995, F & G made more than $53 million in cash contributions to the ESOP. At or about the same time as F & G made the quarterly payments to the ESOP lenders, F & G would make bookkeeping entries to reflect a contribution by F & G to the ESOP in the same amount as the quarterly payment and then a payment of the same amount by the ESOP to F & G. These bookkeeping entries resulted in a reduction of principal and interest owed by the ESOP to F & G by the exact same amount as F & G reduced the amount owing to the ESOP lenders. As a result, in 2001, when F & G filed for bankruptcy, the total outstanding principal due by F & G to the ESOP lenders, and by the ESOP to F & G was the same amount, namely $34,558,252.84.

245. During the course of the bankruptcy, F & G sold assets to pay down monies owed to the ESOP lenders as well as other creditors of F & G. However, this did not alter the indebtedness of the ESOP to F & G. As a result, the ESOP still owes F & G $34,558,252.84 on its original $69,999,998 million loan.

### III. CONCLUSIONS OF LAW

1. Plaintiffs bring their claims under the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(2), 29 U.S.C. § 1132(a)(2) for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). This Court has jurisdiction pursuant to ERISA §§ 502(e)(1) & (f), 29 U.S.C. §§ 1132(e)(1) & (f), and 28 U.S.C. § 1331.

2. Venue is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the ESOP was administered in this district and the breaches complained of took place in this district.

3. ERISA is a comprehensive remedial statute designed to protect the interests of participants in employee benefit plans and their beneficiaries by establishing standards of conduct responsibility, and obligation for fiduciaries of employee benefit plans. 29 U.S.C. § 1001; *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). One of the declared purposes of Congress in adopting ERISA was to increase the likelihood that participants and beneficiaries under employee benefit plans would receive their full benefits as promised. 29 U.S.C. § 1001b(c)(3).

4. One type of employee benefit plan subject to the provisions of ERISA is an ESOP. An ESOP is an ERISA plan that invests primarily in the employer's stock. 29 U.S.C. § 1107(d)(6)(A). A leveraged ESOP, the type at issue in the instant case, is an ESOP which borrows

money from a third party in order to invest in the employer's stock. 29 U.S.C. § 1108(b)(3). If a leveraged ESOP is created, the employer is obligated to make cash contributions to the ESOP, which in turn uses the cash to retire the loan debt. *Donovan v. Cunningham,* 716 F.2d 1455, 1459 (5th Cir.1983). After the ESOP borrows money for a stock purchase, the stock is placed in a "suspense account." As the ESOP makes loan payments using the cash contributions from the corporate sponsor, stock is released from the suspense account and is placed into the ESOP participants' individual accounts.

5. F & G was an employer engaged in commerce or in an industry or activity affecting commerce within the meaning of ERISA. ERISA § 4(a), 29 U.S.C. § 1003(a)(1).

6. The ESOP was an employee pension benefit plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2) and a plan within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3).

7. F & G is or was at all relevant times the sponsor of the ESOP within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16).

8. Plaintiffs are participants in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

9. Defendant U.S. Trust was trustee of the ESOP and a fiduciary with respect to the ESOP. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

### *Fiduciary Duties Under ERISA*

■ 10. ERISA imposes the highest standard of conduct known to law on fiduciaries of employee pension plans. *Reich v. Valley National Bank of Arizona,* 837 F.Supp. 1259, 1273 (S.D.N.Y.1993), *quoting Donovan v. Bierwirth,* 680 F.2d 263 (2nd Cir.1982); *Kuper v. Iovenko,* 66 F.3d 1447, 1453 (6th Cir.1988). However, this is not equivalent to a standard of absolute liability, as ERISA fiduciaries are only required to exercise prudence, not prescience or omniscience. *Frahm v. Equitable Life Assurance Society of the United States,* 137 F.3d 955, 960 (7th Cir.1998); *DeBruyne v. Equitable Life Assurance Society of the United States,* 920 F.2d 457, 465 (7th Cir. 1990).

■ 11. Under the section 404(a) duty of loyalty, ERISA fiduciaries must act "solely in the interest of plan participants and beneficiaries," for the "exclusive purpose" of providing benefits to them. *Engle,* 727 F.2d at 125–126; *Newton v. Van Otterloo,* 756 F.Supp. 1121 (N.D.Ind.1991).

12. ERISA fiduciaries must also discharge their duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). That being said, the Court cannot ignore the fact that in the context of this case, a prudent person acting in like capacity would be acting as a fiduciary to an ESOP, which Congress has recognized to have a significantly different nature and purpose than traditional employee benefit plans. *Vartanian v. Monsanto Co.,* 131 F.3d 264, 269 (1st Cir.1997), *citing* H.R. Conf. Rep. No.93–1280, at 302 (1974); 131 Cong. Rec. S10481–01 (1985), U.S.Code Cong. & Admin.News 1974, p. 5038.

■ 13. ESOPs are, by definition, "designed to invest primarily in qualifying employer securities" and serve as a vehicle for employees to obtain an ownership interest in their employer. 29 U.S.C. § 1107(d)(6)(A). As the investment choices of an ESOP fiduciary are effectively limited to a decision of whether or not to purchase shares of the employer company, the focus is generally on the adequacy of

consideration and the good faith basis for the fiduciary's determination that the ESOP is not giving more than adequate consideration for the stock. *Howard v. Shay,* 100 F.3d 1484, 1489 (9th Cir.1996); *Martin v. Feilen,* 965 F.2d 660, 665 (8th Cir.1992).

■ 14. When a fiduciary has dual loyalties, his independent investigation into the basis for a particular investment decision that presents a potential conflict of interest must be both intensive and scrupulous to satisfy ERISA. *Donovan v. Bierwirth,* 538 F.Supp. 463 (E.D.N.Y.1981), *modified on other grounds,* 680 F.2d 263 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

■ 15. Even if not asked, ERISA fiduciaries must make "full and complete" disclosure and "communicate material facts affecting the interests of beneficiaries." *Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986, 991 (7th Cir.1993); *Bowerman v. Wal–Mart Stores, Inc.,* 226 F.3d 574, 590 (7th Cir.2000).

■ 16. This duty to provide material information arises under ERISA § 404(a), 29 U.S.C. § 1104(a). *Bowerman,* 226 F.3d at 590. This duty requires disclosure to other fiduciaries acting on behalf of the plan's beneficiaries. *Glaziers and Glassworkers Union Local No. 252 Annuity Fund,* 93 F.3d at 1182 (3rd Cir.1996); *Midwest Community Health Service, Inc. v. American United Life Insurance Co.,* 255 F.3d 374, 379 & 375–6 (7th Cir.2001).

### *Fiduciary Claims Against Foster, Regal and Pellegrino*

17. It is undisputed that Foster, Regal, and Pellegrino were not named fiduciaries within the meaning of ERISA.

18. Nevertheless, even if not a named fiduciary, one is a fiduciary with respect to an ERISA plan if, inter alia, "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or ... he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated [by named fiduciaries] under section 405(c)(1)(B) [29 USC § 1105(c)(1)(B)]." 29 U.S.C. §§ 1002(21)(A)(i) & (A)(iii).

■ 19. The power to appoint and remove plan fiduciaries makes members of a board of directors fiduciaries, requiring adherence to the ERISA standards. *Leigh v. Engle,* 727 F.2d 113, 133–34 (7th Cir.1984).

■ 20. The Court finds that Foster, Regal and Pellegrino were fiduciaries with respect to the selection of U.S. Trust as successor trustee for the ESOP. However, any fiduciary duties owed by these individuals did not extend beyond December 20, 1995, as the evidence at trial did not establish that they exercised any discretionary authority or control over the management or assets of the ESOP at any other time or in any other manner.

■ 21. Plaintiffs contend that Foster, Regal, and Pellegrino failed to disclose material information about MBC's sweepstakes marketing to U.S. Trust and its advisors. However, this claim must fail as the evidence adduced at trial did not establish that any of these three individuals withheld or attempted to conceal material information from the U.S. Trust team. To the contrary, Foster is not even listed as having received a copy of the due diligence request list, and there is nothing in the record that demonstrates that he was even involved in the document production for the Sonnenschein Firm. Testimony at trial also indicated that Regal and Pellegrino, who did receive a copy of the document

request, instructed the management and other employees of F & G to provide access to anything and everything that was requested.

22. The record would also reflect that neither Regal nor Pellegrino were ever informed by anyone that F & G's production was less than adequate or that the Sonnenschein Firm had not received any information that had been requested. Thus, there is no basis for finding that F & G management had any reason to know that their understanding that arguably responsive legal documents were being produced by outside counsel was apparently incorrect.

23. Plaintiffs' claim would fail for the additional reason that the Court has found that MBC's sweepstakes marketing practices and the governmental regulatory inquiries that existed prior to December 20, 1995, did not pose a material risk to F & G. Accordingly, Foster, Regal and Pellegrino could not have breached any fiduciary duty to provide material information to U.S. Trust regarding these subjects.

24. There was likewise no evidence that Foster, Regal, or Pellegrino effectively induced U.S. Trust to approve and proceed with the ESOP II transaction through the use of fraudulent and/or negligent misrepresentations and omissions.

25. A fiduciary responsible for appointing a plan trustee or administrator has "a duty to monitor appropriately" the actions of the appointed trustee or administrator. *Engle*, 727 F.2d at 135. Although Plaintiffs had asserted a claimed breach of fiduciary duty against Foster, Regal, and Pellegrino based on an alleged failure to monitor U.S. Trust after its appointment, Plaintiffs abandoned pursuit of this claim during trial.

26. Additionally, the Seventh Circuit has found that ERISA directs courts to look beyond a fiduciaries' formal authority with respect to the plan and to consider what real authority they had over plan investment by virtue of their having appointed the plan administrators. *Id.* For example, the court in Engle noted that by choosing the particular administrators that were selected, the fiduciary had obtained de facto control over plan investment decisions.

27. The Court does not understand Plaintiffs to have asserted any breach of fiduciary duty in connection with the decision to appoint U.S. Trust as the transactional trustee for purposes of the ESOP II transaction or as successor trustee to Magna Bank. However, even assuming that such a breach was alleged, the evidence produced at trial did not support a finding that U.S. Trust was anything other than a highly qualified, independent trustee. The evidence presented at trial did not establish that Foster, Regal, and Pellegrino, acting as shareholders, officers, and members of the executive committee of F & G, exercised extensive control over the structure and orchestration of the December 20, 1995, transaction such that they effectively retained *de facto* control over the transaction, or that the selection of U.S. Trust as trustee for the ESOP was so inextricably intertwined with the desired end of effectuating the stock purchase transaction that the act of appointing the trustee essentially exercised *de facto* control over the plan's assets and management. In fact, the evidence established that the ESOP II transaction was almost abandoned because of U.S. Trust's refusal to share the basis for its valuation determination or agree to the share price sought by the selling shareholders. These actions by U.S. Trust contradict any assertion that Foster, Regal, and Pellegrino retained *de facto* control over the transaction.

28. As the record does not establish any exercise of *de facto* control by Foster,

Regal, and Pellegrino, Plaintiffs have failed to prove that these individuals breached any fiduciary duty in connection with the appointment of U.S. Trust as successor trustee of the ESOP.

### Prohibited Transaction Claims

29. ERISA prohibits transactions between an employee benefit plan and a "party in interest" (ERISA Section 3(14), 29 U.S.C. § 1002(14)) because of the obvious conflicts of interest and the high potential for abuse and injury to the plan. ERISA § 406, 29 U.S.C. § 1106. Therefore, a fiduciary with respect to a plan is not permitted to cause the plan to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect: (a) sale or exchange of any property between the plan and a party in interest; (b) loan of money or other extension of credit between the plan and a party in interest; or (c) transfer to, or use by or for the benefit of, a party in interest of any assets of the plan. ERISA § 406(a), 29 U.S.C. § 1106(a).

30. It is undisputed that on December 20, 1995, U.S. Trust caused the ESOP to purchase $70 million in shares of F & G from Foster, Regal, Pellegrino and other parties in interest to the ESOP within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14). The purchase of shares in F & G by the ESOP on December 20, 1995 was a transaction which constituted a sale or exchange of property between the ESOP and one or more parties in interest within the meaning of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A).

31. Accordingly, unless the December 20, 1995 transaction was exempt from ERISA's prohibited transactions pursuant to the exemption set forth in § 408 of ERISA, 29 U.S.C. § 1108, U.S. Trust would have violated ERISA when it caused the ESOP to purchase those shares.

32. The exemption set forth in § 408(e) provides in relevant part:

Section 406 and 407 shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 407(d)(5)) ... (1) if such acquisition, sale, or lease is for adequate consideration (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 407(e)(1)), (2) if no commission is charged with respect thereto, and (3) if (A) the plan is an eligible individual account plan (as defined in section 407(d)(3)). . . .

Section 407(d)(5), 29 U.S.C. § 1107(d)(5) then defines a "qualifying employer security" to include the stock of the employer, and § 407(d)(3)(A), 29 U.S.C. § 1107(d)(3)(A), then defines an "eligible individual account plan" to include an ESOP.

33. There is no evidence that any commission was paid in connection with the ESOP II transaction, as U.S. Trust was paid a predetermined fee that did not depend upon whether the transaction was actually consummated. Thus, the real issue under the § 408(e) exemption is whether the ESOP paid more than adequate consideration for the shares it purchased on December 20, 1995.

34. A fiduciary who claims that ERISA § 408 exempts a transaction from the prohibitions of ERISA § 406(a) has the burden of proving that the employer securities were purchased for no more than adequate consideration within the meaning of ERISA § 3(18), 29 U.S.C. § 1002(18).

35. Since there was no public market for F & G's shares, adequate consideration is the fair market value of the shares determined in good faith by U.S. Trust. ERISA § 3(18), 29 U.S.C. § 1002(18). This definition has two distinct parts – the "fair market value" part and the "as determined in good faith by the trustee" part ---

both of which must be proven by the fiduciary.

■ 36. "Fair market value" is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. *Eyler v. Commissioner*, 88 F.3d 445, 451 (7th Cir.1996).

■ 37. The "good faith" requirement establishes an objective rather than a subjective standard of conduct, which is assessed in light of all relevant facts and circumstances. *Montgomery v. Aetna Plywood, Inc.*, 39 F.Supp.2d 915, 937 (N.D.Ill.1998).

■ 38. "ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Chao v. Hall Holding Co.*, 285 F.3d 415, 437–38 (6th Cir.2002), *citing Donovan v. Cunningham*, 716 F.2d 1455, 1467–68 (5th Cir.1983); *Eyler*, 88 F.3d at 455.

■ 39. The ultimate outcome of an investment is not proof that a fiduciary acted imprudently. *DeBruyne*, 920 F.2d at 465. Again, the fiduciary's duty of care "requires prudence, not prescience," and the appropriateness of an investment is to be determined from the perspective of the time the investment was made, not from hindsight. *Id.*

■ 40. A trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill, but it must ultimately make its own decision based on that advice. Yet before relying an advisor's opinion, the fiduciary must conduct a prudent and sufficient investigation and make certain that reliance on the advisor's advice is reasonably justified under the circumstances. *Chao*, 285

F.3d at 430; *Cunningham*, 716 F.2d at 1473–4; *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3rd Cir.1996) ("ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary.")

■ 41. Assigning qualified individuals with appropriate experience to work in concert with financial and legal advisors who are also highly experienced is evidence that a trustee conducted a prudent investigation. *Howard*, 100 F.3d at 1489; *Martin*, 965 F.2d at 671.

42. Here, the primary individuals assigned by U.S. Trust to work on the F & G transaction were Goldberg and Shea. The evidence presented at trial indicated that both Goldberg and Shea were qualified for this assignment and had substantial past experience in ESOP transactions; Plaintiffs have made no argument to the contrary.

43. U.S. Trust engaged Houlihan, a qualified valuation firm with extensive experience in ESOP transactions, to work on the transaction and worked in tandem with Houlihan to evaluate the financial aspects of the transaction. Plaintiffs have not suggested that Houlihan was not an experienced and qualified valuation expert.

44. Houlihan issued an opinion indicating that, based on its independent analysis and valuation, the median of the range of fair market value for F & G stock was $19.81 per share. Accordingly, Houlihan opined that the $19.50 price per share was not greater than adequate consideration for the securities, the transaction was fair and reasonable to the ESOP from a financial point of view, the loan between the ESOP and F & G was fair and reasonable from a financial point of view, and the interest rate for the loan was fair and reasonable from a financial point of view.

45. Before it could rely on Houlihan's opinion in connection with the December 20, 1995 transaction, U.S. Trust had a duty to verify that the information on which Houlihan's opinion was based was accurate and that Houlihan's assumptions made sense. The record indicates that U.S. Trust did precisely that in this case.

46. Both U.S. Trust and Houlihan went to considerable lengths to understand F & G's business and independently assess the merits of the ESOP II transaction, including interviewing members of management, visiting F & G's facilities, reviewing business plans, and examining financial documents.

47. The record is also clear that U.S. Trust and Houlihan probed and challenged a number of assumptions in Valuemetrics' evaluation before developing their own independent evaluation that formed the basis for a price per share at closing that was almost 20% less than the selling shareholders' offering price.

48. While Sarafa and Strassman of Houlihan knew that MBC used sweepstakes marketing extensively and that MBC was a main revenue center for F & G, Houlihan did not consider the risk of governmental regulation of the sweepstakes industry or any threat posed by MBC's dependency on sweepstakes in assessing the value of F & G stock. Considering the record in its entirety, it is clear that the reason why Houlihan did not factor these circumstances into its valuation analysis is that no one at the time of the 1995 transaction, including experts in the area of sweepstakes marketing, either knew or reasonably should have known that these matters posed any material risk to F & G or could be expected to pose any material risk to F & G in the foreseeable future.

49. Thus, with respect to the financial/valuation aspect of the transaction, U.S. Trust investigated the December 20, 1995, transaction with the care, skill, prudence, and diligence that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims and could properly have relied on Houlihan's expert analysis.

50. U.S. Trust also engaged the Sonnenschein Firm, a respected law firm known for its expertise in ERISA litigation, to perform the legal due diligence and serve as its legal advisor for the transaction. Plaintiffs have not suggested that the Sonnenschein Firm was not an experienced and qualified legal expert.

51. U.S. Trust obtained an extensive opinion from counsel with regard to ERISA and IRS matters in connection with the December 20, 1995, transaction, and the Court finds no fault with that portion of the Sonnenschein Firm's services. However, a careful review of that written legal opinion would have revealed that it was confined solely to the ERISA/IRS aspect of the transaction and expressly excluded any consideration of any other laws. The testimony at trial indicated that it was the custom in the industry for there to be no formal written report documenting the results of corporate legal due diligence. The Court finds this custom in the industry unacceptable. When a trustee is being asked to determine whether an ESOP should purchase $70 million of the employer's stock, every aspect of the legal due diligence must be meticulously documented, for two reasons: (1) so that the trustee has clear, unambiguous advice upon which to base an informed decision; and (2) so that there is a clear and unambiguous written record in existence by which to later test the appropriateness of the trustee's decision making process if that becomes necessary.

52. The evidence established that U.S. Trust's counsel did conduct some corpo-

rate legal due diligence of F & G with respect to issues other than ERISA and IRS matters. However, it appeared to be a rush job, during which there is no evidence in the record that potentially relevant issues made known to the attorneys with the Sonnenschein Firm received any follow-up or clarification.

53. Specifically, U.S. Trust's counsel was provided with Awerdick's audit letters and legal reports to F & G's board of directors containing references to recent inquiries by three state attorney general's into MBC's sweepstakes, but there is no evidence that any additional inquiries were made. There were also references to perceived "threats" from sweepstakes dependency and government regulation in MBC's strategic plans. U.S. Trust's counsel reported on matters like litigation over the pictures of cats on popcorn tins and a supplier agreement that might have needed approval, but there was no evidence in the record indicating that he even mentioned the pending inquiries from state attorneys general regarding MBC's sweepstakes or conducted enough of an investigation to reasonably determine whether such inquiries were material. Testimony at trial suggested that such matters would be routinely discussed and presented orally during the legal due diligence process. While this may be true, and an appropriate investigation may in fact have been done, there was a complete failure to document any such efforts. That failure to document precludes the Court from making a finding that an adequate corporate legal due diligence was conducted.

54. There is no evidence indicating that the Sonnenschein Firm ever communicated any concerns to U.S. Trust about the adequacy of the time available to conduct legal due diligence, any lack of cooperation on the part of F & G, or the existence of inquiries from state attorneys general into MBC's sweepstakes marketing practices.

Absent the communication of any material concerns, Goldberg of U.S. Trust presumed that there were none.

55. Goldberg testified that had he been provided with the same information provided to U.S. Trust's counsel, he would have asked for a further understanding in order to determine the materiality of the information. However, Goldberg stated that given his understanding of the industry, the outcome of the transaction would not have been different.

56. Had there been further investigation into the sweepstakes inquiries, the uncontroverted evidence of record indicates that U.S. Trust would have discovered that none of the state attorney general inquiries received by MBC prior to December 20, 1995, had resulted in any enforcement action or negative consequences to the company and that the inquiries pending at that time were expected to be resolved in the normal course of business without any material consequences. While sweepstakes marketing was beginning to receive a higher degree of scrutiny from governmental regulatory agencies, and therefore posed the possibility of a greater likelihood of enforcement through consumer protection laws, the evidence presented at trial indicated that 1995 was a "quiet" period in the industry from a regulatory perspective.

57. Defendants' expert Durchslag testified that experts in sweepstakes law would not have considered the few state inquiries received by MBC in 1995 to be material or a sign of significant impending regulatory problems. Accordingly, there is no basis for the assertion that consideration of sweepstakes risk by a prudent investor would have reduced the value of F & G stock or caused a prudent investor not to engage in the ESOP II transaction at all. The fact that U.S. Trust and its legal advisor did not identify a risk that the

Court finds was not material cannot be considered evidence of an imprudent or bad faith investigation for purposes of precluding an otherwise applicable exemption under § 408(e).

58. Plaintiffs' expert Wolski testified that U.S. Trust's performance was deficient for failing to utilize an independent accounting firm as part of the due diligence team to review F & G's financials. However, Wolski testified that he had never worked on an ESOP transaction and was not experienced in the area of ESOPs, so his testimony in this regard is entitled to little weight. While hiring an independent CPA firm might be an advisable undertaking when considering a major stock purchase in a non-ESOP transaction on the open market, there is nothing in the record indicating that such a step is legally required in an ESOP transaction or that a qualified financial advisor's review of the independently audited financial statements as part of its analysis would not be compliant with the standards and practices of prudent ESOP trustees. Additionally, the Court notes that Wolski testified that his fees incurred through the time of his testimony were approximately $350,000.00. As Wolski was engaged to review the due diligence performed in connection with the 1995 stock purchase transaction and did not perform the audit/financial review that he testified should have been done by a CPA firm in this case, it would appear that the kind of expert assistance that he recommended would be cost prohibitive in many ESOP transactions.

59. As the $19.50 purchase price was supported by the valuations performed by Valuemetrics and Houlihan, as well as by the retrospective valuation performed by Reilly, and the Court has found the testimony by Plaintiffs' expert Hitchner that the value of F & G stock in 1995 was lower than $19.50 per share to be less credible, and the record does not demonstrate that

U.S. Trust either arrived at its determination of fair market value imprudently or acted in bad faith, the Court finds that the ESOP II transaction was not for more than adequate consideration.

60. The December 20, 1995, purchase of shares in F & G by the ESOP was therefore exempt from ERISA's prohibited transactions, and Plaintiffs' prohibited transaction claim against U.S. Trust must fail.

61. Plaintiffs have also asserted a prohibited transaction claim against Foster, Regal, and Pellegrino. This claim is essentially based on the theory that these individuals, acting as the executive committee, effectively controlled whether the ESOP II transaction would proceed through the appointment of U.S. Trust as trustee and had a corresponding duty to oversee the due diligence conducted by the U.S. Trust team. When questioned at trial as to how U.S. Trust could have functioned as an independent trustee if the members of F & G's executive committee (who were also selling shareholders) were supervising its due diligence process, Plaintiffs' counsel clarified that the duty of oversight was really coextensive with the fiduciary duty to provide accurate and material information.

62. The Court has previously determined that Foster, Regal, and Pellegrino did not breach any fiduciary duty by failing to disclose or attempting to conceal any material information in connection with the ESOP II transaction. It is also clear from the record that Foster, Regal, and Pellegrino could not have breached any fiduciary duty by causing the ESOP to enter into a transaction prohibited by ERISA § 406, because it was U.S. Trust, and not these individuals, that made the independent decision that caused the ESOP to purchase shares in F & G on December 20, 1995, and any argument that

U.S. Trust was anything other than an independent trustee has previously been rejected. Thus, there is no reason why Foster, Regal, and Pellegrino would not also be entitled to the protection of the § 408(e) exemption.

### Claim Against U.S. Trust for Failure to Take Action Following the December 20, 1995 Transaction

63. A fiduciary's duty to investigate the plan's administration is not limited to the time before such investments were made. Rather, "[o]nce the investment is made, a fiduciary has an ongoing duty to monitor investments with reasonable diligence and remove plan assets from an investment that is improper." *Harley v. Minnesota Mining and Mfg. Co.*, 42 F.Supp.2d 898, 906–07 (D.Minn.1999), *affirmed*, 284 F.3d 901 (8th Cir.2002); *see also, Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1402–04 (9th Cir. 1995); *Morrissey v. Curran*, 567 F.2d 546, 549 n. 9 (2nd Cir.1977).

64. U.S. Trust commonly received legal reports to F & G's board of directors after the 1995 transaction, and Goldberg attended some F & G board meetings during which legal matters were discussed, including inquiries from state attorneys general, the Assurance of Discontinuance with the State of Michigan, and settlements with Connecticut and Vermont. Goldberg testified that he was aware of these incidents shortly after they occurred. Testimony at trial also indicated that U.S. Trust also took an active role in the annual valuation process.

65. Plaintiffs have made much of the fact that U.S. Trust made no investigation to determine whether the ESOP had any recourse against any of the parties or advisors involved in the 1995 transaction after the dramatic decline in ESOP share value reported for December 31, 1998, or even up to the time that this lawsuit was filed. However, Plaintiffs' argument is premised on the assertion that the 1995 transaction was an imprudent investment at the time the ESOP II transaction occurred. That assertion was not borne out by the evidence presented at trial.

66. It is important to note that because Plaintiffs' theory of the case was premised on this assertion, the focus of Plaintiffs' monitoring claim was the argument that, when business started going bad for F & G in 1998, U.S. Trust should have gone back and investigated the circumstances surrounding the 1995 transaction in order to preserve any claims against the participants in that transaction. Plaintiffs did not claim that as the value of F & G stock began to decline, U.S. Trust should have asserted its prerogative to become more actively involved in the management of the company or to have taken certain steps to correct corporate mismanagement in the post-February 1998 business climate.

67. Goldberg credibly testified that the reason he made no investigation into any recourse against those involved in the 1995 transaction was because he had been monitoring the situation at F & G and was confident that the reason for the decline in ESOP share value was the wave of adverse publicity following the incident with American Family Publishers in February 1998 and the precipitous drop in response rates that ensued thereafter. Thus, he did not consider the claims suggested by Plaintiffs to have had any real merit.

68. As the Court has rejected the assertion that Foster, Regal, and Pellegrino breached any fiduciary duty owed to the ESOP in connection with the 1995 transaction, any such claim would have been without merit.

69. Any claim against Houlihan would have been similarly unmeritorious, as there was no flaw with Houlihan's performance of its role as financial advisor to U.S. Trust in connection with the ESOP II

transaction. The sweepstakes risk that Plaintiffs claim should have been included in Houlihan's analysis was not of the magnitude suggested by Plaintiffs and was not a material risk in December 1995. Accordingly, the fact that this information was not factored into Houlihan's analysis was not erroneous, as it would have had no material effect on the validity of the valuation opinion.

70. To the extent that the Sonnenschein Firm failed to conduct proper legal due diligence, a claim against the firm would not have yielded any recovery for the ESOP, as there is no evidence of record indicating that a more thorough investigation into MBC's sweepstakes marketing practices by state attorneys general would have stopped the ESOP transaction from occurring, caused the transaction to proceed at a lower share price, or prevented the decline in value of the ESOP's shares of F & G stock beginning in 1998. To the contrary, the evidence produced at trial established that full knowledge of the information about MBC's sweepstakes marketing practices and governmental inquiries that existed on December 20, 1995, would not have changed the outcome of the transaction, and that the loss in value of the ESOP's shares was caused by the dramatic decline in customer responses following the unprecedented wave of anti-sweepstakes publicity in 1998.

71. Plaintiffs suggest that U.S. Trust should have pursued claims against Foster, Regal, and Pellegrino for breach of duty owed to the ESOP by virtue of the representations and warranties contained in the Stock Purchase Agreement, yet there is no evidence establishing that there was any such breach. Those warranties included a warranty that F & G and its subsidiaries "are in compliance with all applicable laws, except those of which a violation would not and, so far as each Controlling Shareholder can now foresee, will not, individually or in the aggregate, materially adversely affect the" business of F & G and its subsidiaries. As it was reasonably believed by both F & G management and experts in the field at the time that governmental inquires related to sweepstakes marketing were not material concerns, the warranties made by Foster, Regal, and Pellegrino were not false or breached.

72. Plaintiffs have cited no authority requiring a prudent ESOP trustee to pursue every conceivable claim that a plan could have brought against third parties regardless of its perceived merit. Accordingly, given the prior findings of the Court, there is no basis for Plaintiffs' suggestion that U.S. Trust should have investigated and pursued claims against Foster, Regal, Pellegrino, Houlihan, or the Sonnenschein Firm. Any such claims would only have caused the ESOP to expend substantial resources on unsuccessful litigation.

### Claim that U.S. Trust Acted Without Authority

73. Plaintiffs originally claimed that in consummating the 1995 stock purchase transaction, U.S. Trust acted without authority because Magna Bank's removal as ESOP trustee was not complete on December 20, 1995. As a result, Plaintiffs asserted that U.S. Trust and Magna Bank were co-trustees at that time and that U.S. Trust could not have acted on behalf of the ESOP without Magna Bank's consent. As the record in this case established that Magna Bank was aware of the ESOP II transaction but made no effort to object to U.S. Trust acting as trustee at closing, ask to attend the closing itself, try to prevent the closing, or make any attempt to be involved in the decisionmaking process, and Plaintiffs presented no evidence that Magna Bank asserted that it was still trustee at the time of the ESOP II transaction, that its approval was necessary, or that Magna Bank ever took any

action to challenge the ESOP II transaction on any grounds, Magna Bank either waived or ratified any technical defects in the process of its removal as trustee of the ESOP. A directed verdict to this effect was entered in favor of U.S. Trust at trial.

### Liability for Breach of ERISA Fiduciary Duties

74. A fiduciary who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by Title I of ERISA is personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits which have been made through use of assets of the plan by the fiduciary. ERISA § 409, 29 U.S.C. § 1109.

75. The "resulting from" language means that "a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan." *Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir.1982); *Silverman v. Mutual Benefit Life Insurance Co.,* 138 F.3d 98, 104 (2nd Cir.1998).

76. The burden of proving that any loss was not caused by the fiduciary's breach is upon the fiduciary. *Secretary of U.S. Dept. of Labor v. Gilley,* 290 F.3d 827, 830 (6th Cir.2002); *Chao,* 285 F.3d at 438–39; *Engle,* 727 F.2d at 138–39; *Roth v. Sawyer–Cleator Lumber Co.,* 61 F.3d 599, 605 (8th Cir.1995) ("If a breach of fiduciary duty caused the Plan to purchase Company stock which declined in value, the causal link between the breach and the loss is established, even if the Company stock would have inevitably declined in value.")

77. As the Court has found no breach of any fiduciary duty owed by Foster, Regal, or Pellegrino, there is no occasion to consider the question of damages on Plaintiffs' claim against them.

78. As the Court has found no breach of fiduciary duty by U.S. Trust in relying on the opinion of Houlihan as its financial advisor or failing to investigate and take action to preserve claims on behalf of the ESOP, there is no occasion to consider the question of damages on these claims.

79. The Court has found that on the record in this case, the Sonnenschein Firm's failure to identify a risk that was not material was not evidence of an imprudent or bad faith investigation for purposes of precluding an otherwise applicable exemption under § 408(e). As ERISA § 406 only prohibits an ESOP trustee from purchasing employer securities from parties in interest if the trustee does not meet the requirements of ERISA § 408(e), and the Court has found that U.S. Trust has satisfied the requirements of the § 408(e) exemption, there is no occasion to consider the question of damages on Plaintiffs' prohibited transaction claim.

80. Alternatively, even assuming that U.S. Trust had breached a fiduciary duty by improperly relying on the inadequate legal due diligence conducted by the Sonnenschein Firm, U.S. Trust has met its burden of demonstrating that any loss to the ESOP was not caused by any such breach. The portion of the corporate legal due diligence that was either overlooked or undocumented, namely the regulatory inquiries made by state attorneys general into MBC's sweepstakes marketing practices and the risk of sweepstakes dependency, was not a material consideration with respect to the propriety of the ESOP II transaction and posed no actual or reasonably foreseeable material risk to F & G at the time of the 1995 transaction. There is no credible evidence of record establishing that any different actions by U.S. Trust would have had any impact on the outcome of the ESOP II transaction.

81. Moreover, the record established that the cause of the loss to the ESOP was the decline in customer response rates

brought on by the adverse publicity following the American Family Publishers incident in February 1998, as well as possible acts of corporate mismanagement related thereto, and not any material risk to the value of F & G stock due to sweepstakes dependency or governmental regulation of the sweepstakes industry in connection with the ESOP II transaction on December 20, 1995, as suggested by the Plaintiffs.

82. There is therefore no occasion to consider the question of damages on Plaintiffs' claim against U.S. Trust for breach of fiduciary duty based on its reliance on the legal due diligence performed by the Sonnenschein Firm.

## IV. CONCLUSION

For the reasons set forth above, the Court finds in favor of Defendants U.S. Trust, Regal, and Pellegrino and against Plaintiffs on the breach of fiduciary duty claims asserted in the First, Third, and Fifth claims for relief in the First Amended Complaint. The Court will contact the parties in the near future to schedule a telephonic conference call at which the process for resolving the remainder of this litigation will be discussed.